# IN THE SUPREME COURT OF IOWA

No. 13–1397

Filed March 25, 2016

**STATE OF IOWA,**
    Appellant,

vs.

**DEMETRIUS S. RIMMER,**
    Appellee.

_____

**STATE OF IOWA,**
    Appellant,

vs.

**RONA MURPHY,**
    Appellee.

_____

**STATE OF IOWA,**
    Appellant,

vs.

**MELONICKA THOMAS,**
    Appellee.

_____

On review from the Iowa Court of Appeals.


Appeal from the Iowa District Court for Scott County, Mary E. Howes, Judge.


Defendants seek further review of the court of appeals decision that reversed the district court's ruling dismissing criminal charges against them for lack of territorial jurisdiction. **DECISION OF COURT**

**OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED.**

Thomas J. Miller, Attorney General, Alexandra Link, Assistant Attorney General, Michael J. Walton, County Attorney, and Kelly Cunningham, Assistant County Attorney, for appellant.

Mark C. Smith, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellee Demetrius S. Rimmer.

Thomas J. O'Flaherty of O'Flaherty Law Firm, Bettendorf, for appellee Rona Murphy.

Jack E. Dusthimer, Davenport, for appellee Melonicka Thomas.

**WATERMAN, Justice.**

Can criminal defendants avoid prosecution in Iowa if they were unaware that their scheme was being perpetrated, in part, on persons located in Iowa? This appeal presents questions of first impression regarding the State of Iowa's territorial jurisdiction to prosecute multistate insurance fraud. The defendants, who live in Wisconsin and Illinois and had never set foot in Iowa before their extradition here, allegedly staged an auto accident in Chicago to collect on false insurance claims. The victim was a Wisconsin insurance company that paid claims through its Wisconsin bank account. The accident was investigated by two employees of the insurer's Davenport, Iowa branch office, who spoke with the defendants by phone and interviewed one of them in Wisconsin. The defendants allegedly made false statements during the phone calls but were unaware that the investigators were in Iowa during that time. The defendants argue they are not subject to prosecution here. The district court granted the defendants' motion to dismiss for lack of jurisdiction, and the State appealed. We transferred the case to the court of appeals, which reversed and reinstated the criminal charges. We granted the defendants' applications for further review.

For the reasons explained below, we conclude the phone calls between the defendants located in Wisconsin and Illinois and the victim's investigators in Davenport induced payments on false insurance claims, a detrimental effect in Iowa, which thereby constituted an element of four out of the five crimes charged. We hold that the defendants' challenges to territorial jurisdiction fail as to those four crimes and this prosecution may proceed on those charges under the criminal jurisdiction statute, Iowa Code section 803.1 (2011). We affirm the dismissal of a fifth charge because the State fails to show any defendant submitted a false written

statement or certificate in Iowa. Accordingly, we vacate the decision of the court of appeals, affirm the district court's dismissal of that charge, and reverse the decision of the district court that dismissed the other criminal charges. We remand these cases to allow the criminal prosecution to proceed on the reinstated charges.

## I. Background Facts and Proceedings.

The trial information and minutes of testimony allege these facts, which we accept as true for purposes of this appeal.[1] The defendants, Demetrius Rimmer, Rona Murphy, and Melonicka Thomas, participated in an insurance fraud ring that staged car accidents in Chicago, Illinois. Murphy and Thomas are Illinois residents, and their vehicles were registered in Illinois. Rimmer is a Milwaukee, Wisconsin resident, and his car was registered in Wisconsin. On November 23, 2011, Rimmer purchased an insurance policy for his Dodge Charger from Viking Insurance Company of Wisconsin (Viking Insurance). On the night of January 6, 2012, Rimmer, Murphy, and Thomas staged a three-car accident at an intersection in Chicago. Rimmer claimed that he approached a stoplight too fast and his Charger rear-ended Murphy's Chevy Trailblazer, causing it to strike Thomas's BMW X5 as she drove through the intersection. Rimmer and Murphy went to a Chicago police station to report the accident, but no officers responded at the scene.

Rimmer called the 1-800 number on the back of his insurance card. The call was answered by an insurance company employee in Kentucky.[2] Rimmer admitted the accident was his fault. He was told

---

[1]"We accept as true the facts alleged by the State in the trial information and the minutes of testimony" when reviewing a ruling on a motion to dismiss. *State v. Finders*, 743 N.W.2d 546, 548 (Iowa 2008).

[2]The location of the call center that answers the 1-800 number calls was not provided in the trial information or minutes. Murphy's trial counsel informed the court

that a regional claims representative would contact him. Rimmer's claim was assigned to the Davenport office of Sentry Insurance Company (Sentry), the parent corporation of Viking Insurance. Sentry and Viking Insurance are incorporated and headquartered in Wisconsin. Sentry's claim adjuster, Greg Perren, called each driver from his Davenport office. Perren interviewed each driver by phone to inquire how the accident occurred and to obtain information about each vehicle and claimant. All three drivers claimed their vehicles were damaged in the accident. Thomas also claimed that she had a whiplash injury. Perren requested inspections of each vehicle. A Sentry adjuster from its Wisconsin office inspected and photographed each vehicle's damage and estimated the repair costs. The adjuster inspected Murphy's and Thomas's vehicles in Illinois and Rimmer's in Wisconsin.

As Perren questioned each driver by phone, he found that their stories diverged. For example, Thomas claimed her BMW was hit while she was traveling eastbound through the intersection. However, Rimmer and Murphy stated the Trailblazer hit Thomas's BMW as it traveled westbound. Murphy later changed her story to say she hit the BMW head-on. Murphy also claimed she had a passenger with her, but the other drivers said Murphy was alone.

Perren also concluded the photographs contradicted their statements. Murphy and Thomas claimed Rimmer's Charger was drivable with minor damage. By contrast, Rimmer reported his car was towed from the scene to Milwaukee with extensive front-end damage. Yet Murphy's Trailblazer had only minor rear-end damage. Thomas's BMW

_____

during the hearing on the motion to dismiss that calls to the 1-800 number are routed to Paducah, Kentucky.

had a cracked front bumper but no damage to either side despite the conflicting statements it had been struck broadside. And Thomas initially told Perren that she drove away from the scene but later claimed her car had been towed to Crestwood, Illinois. Murphy, however, did not remember any of the vehicles being towed.

Perren authorized $500 to settle Thomas's personal injury claim. Viking Insurance's Wisconsin bank mailed Thomas a check on January 18. Perren authorized $6805 for damage to Rimmer's Charger and $325 for towing reimbursement. The same Wisconsin bank mailed the checks to Rimmer at his Wisconsin address on January 20. Perren authorized $3500 for Murphy's vehicle damage.[3]

On January 19, the claim was randomly reviewed for fraud, and the reviewer referred the claim to Greg Wolf, who worked in Sentry's Davenport office. On January 31, Wolf reviewed the paper file and concluded the case warranted further investigation. Wolf conducted recorded telephone interviews of each driver and ran searches on each vehicle's history.[4] He discovered the drivers had claimed the same damage with other insurance companies. He followed up by speaking to the other insurance company representatives and obtaining documentation regarding those claims.

Wolf recorded his phone calls with each driver between February 2 and February 16. Wolf asked how the accident occurred and requested information about the damage to each vehicle. The drivers' answers

---

[3]Each check identified the account holder as Viking Insurance Co. of Wisconsin.

[4]When Wolf searched the Trailblazer's history, he uncovered a match with an accident involving an Iowa resident. Two people, including one Iowa resident, received medical treatment from Palmer Chiropractic in Davenport, Iowa. The State does not rely on these facts to establish jurisdiction.

remained inconsistent, and each driver claimed to not know the other drivers. Wolf never mentioned Iowa in any of these recorded phone calls. He gave Murphy a phone number with a 563 area code, but there is no information that Murphy ever called that number or knew that area code is for part of eastern Iowa. Rimmer left Wolf a voicemail containing fraudulent statements. It is unclear what number Rimmer called to reach the voicemail.

Wolf's investigation uncovered that the same vehicular damages claimed in this accident also had been claimed in other accidents reported under policies with three other insurance companies—Farmers Insurance, Geico Insurance, and American Family Insurance. Wolf discovered that Thomas's BMW had the same mileage in the Farmers Insurance claim for an alleged accident on December 16, 2011, and the Sentry claim for the accident on January 6, 2012. Wolf learned that American Family Insurance had paid for damages in an accident between Murphy's Trailblazer and Thomas's BMW on October 12, 2011. Wolf obtained photographs of the Trailblazer from Geico Insurance and Farmers Insurance showing identical damage as reported in the Sentry claim, even though these other insurance claims were made months earlier. Further, Murphy's car was registered under two names, and Rimmer's car was insured by two insurance companies under different Illinois license plate numbers. Wolf estimated the total amount paid for the fraudulent claims exceeded $50,000.

Wolf tried to meet personally with each defendant. Wolf met Rimmer in Wisconsin and discussed the accident. Rimmer repeated his version of the accident and denied committing any crime. Wolf traveled to Illinois in an attempt to meet with Thomas and Murphy there, but he was unsuccessful.

On April 30, Wolf reported the insurance fraud to Detective Jason Gillaspie at the Davenport Police Department. Wolf told Gillaspie that Sentry had paid $7392 for vehicle damage[5] and $325 in towing reimbursement. On July 18, Detective Gillaspie obtained a warrant for Rimmer's arrest.[6] Detective Gillaspie filed a criminal complaint on July 27 and arrest warrants were issued for Thomas and Murphy that day. All three were arrested in their home states and extradited to Iowa.[7] The Scott County attorney filed a trial information on May 2, 2013, charging each defendant with ongoing criminal conduct in violation of Iowa Code sections 703.1, 703.2, 706A.1, 706A.2, and 706A.4; theft in the second degree in violation of sections 702.9, 703.1, 703.2, 714.1, and 714.2; conspiracy to commit a nonforcible felony in violation of sections 703.1, 703.2, 706.1, and 706.3; fraudulent practices in the second degree in violation of sections 703.1, 703.2, 714.8, and 714.10; and fraudulent submissions in violation of sections 507E.3, 703.1, and 703.2. The minutes of testimony identified several witnesses, including Wolf, Perren, and appraisers from Farmers Insurance, American Family Insurance, and Geico Insurance. The only Iowa resident identified in the minutes was Detective Gillaspie. Wolf and Perren are Illinois residents.

All three defendants moved to dismiss for lack of jurisdiction. The district court conducted a reported hearing on July 29, 2013. Defense

---

[5]A bank that had a lien on the vehicle was paid $1590. The trial information notes a loss of $6806, which is approximately the amount Sentry paid for damage to Rimmer's Charger.

[6]Detective Gillaspie's reports indicate that he did not initially issue a warrant for Rimmer because Rimmer had requested and been given permission from his probation officer in an unrelated case to travel to Davenport for an interview with Detective Gillaspie. When Rimmer failed to show up, Detective Gillaspie requested the warrant.

[7]Murphy contested her extradition in Illinois.

counsel emphasized that none of the defendants had ever been to Iowa before his or her extradition. The defendants also introduced evidence that Sentry has offices in all fifty states but its registration with the Iowa Secretary of State is inactive. Murphy's counsel noted that the State of Illinois had declined to charge the defendants.

The district court orally granted the defendants' motions to dismiss at the hearing. In its written order filed July 31, the district court explained why it found the State of Iowa lacked territorial jurisdiction:

> No evidence was brought forth that the defendants sought out the state of Iowa to allegedly perpetrate this crime. The defendants allegedly submitted an insurance claim for a car accident occurring in the state of Illinois. The insurer was a Wisconsin insurance company. No evidence of the defendants' actions indicate that they intended any contact with the state of Iowa. Thus, the Court does not find intent to produce detrimental effects within the state of Iowa.

> The Court next examines if the defendants did produce detrimental effects within the state of Iowa. The prosecution alleges that the state of Iowa was harmed, because the office contacted by the defendants was located within the state. The prosecution claims that, because Sentry has an office in the state of Iowa and the alleged fraud was perpetrated through contacts with that office, then Sentry was harmed within the state of Iowa.

> Sentry was harmed by the alleged fraud, through a loss of monetary funds. The check was paid from a Wisconsin bank. The evidence showed that Sentry is headquartered in Stevens Point, Wisconsin. The Court finds an agency relationship exists between the different satellite offices, including the Scott County Sentry Office, and the headquarters of Sentry. As such, Sentry was not harmed in an individual office within Scott County, Iowa. Instead, Sentry, the corporate entity was harmed financially, in the state of Wisconsin. Thus, the Court declines to find any detrimental effects within the state of Iowa.

> Finally, the Court examines if any of the essential elements of the crime occurred within the state of Iowa. . . . The prosecution bears the burden to prove that an essential element of the crime occurred within the state of Iowa. No testimony has been brought before the Court establishing an essential element of the crime was committed within the state of Iowa. No accident occurred within the state. No

defendants reside within the state. However, the prosecution contends that the alleged perpetration of fraud to the Scott County Sentry office is sufficient to establish essential elements of the crimes alleged.

The Court finds that the agency relationship dictates that acts occurring in a satellite office, such as the one in Scott County, occur in the corporate entity as a whole. Thus, fraudulent information given to one office is fraudulent information given to the corporate entity. As such, the Court finds that no essential element of a crime occurred within Scott County, Iowa.

The State appealed, and we transferred the case to the court of appeals. The court of appeals reversed and held the telephone conversations amounted to conduct within the State of Iowa:

We find a telephone conversation may constitute conduct within the state even where the defendants (while located out of state) do not have actual knowledge the other speaker is located in Iowa. When these defendants decided to conduct a multi-state conspiracy to defraud an insurance company, they ran the risk that some of the company's employees would be located in another jurisdiction. Deliberate indifference to the location of the recipients of the false information does not shield the defendants from the jurisdiction of Iowa courts. We also find, based on the specific facts in this case, the defendants could have reasonably anticipated they would be subject to criminal prosecution in a state by providing fictitious and fraudulent information solely by the phone calls in question. Although none of the defendants were present in Iowa and the victim insurance company is a Wisconsin entity, as is the bank. We determine that acts done outside a jurisdiction that are intended to cause harm and a detrimental effect in the jurisdiction justify the state's involvement. Although the contacts were minimal, we find the contacts were sufficient for the State to acquire territorial jurisdiction.

The defendants applied for further review, which we granted.

## II. Standard of Review.

We review an order granting a motion to dismiss a charge in a trial information for correction of errors at law. *State v. Gonzalez*, 718 N.W.2d 304, 307 (Iowa 2006). "We accept the facts alleged by the State in the trial information and attached minutes as true." *Id.* We review rulings

on statutory interpretation for correction of errors at law. *Id.*; *see also State v. Wagner*, 596 N.W.2d 83, 85 (Iowa 1999) (reviewing ruling on interpretation of criminal jurisdiction statute for correction of errors at law). We review constitutional claims de novo. *Gonzalez*, 718 N.W.2d at 307.

### III. Analysis.

"[S]tate territorial jurisdiction is an essential element of the crime . . . [that t]he State is required to prove . . . beyond a reasonable doubt." *State v. Liggins*, 524 N.W.2d 181, 184–85 (Iowa 1994). The defendants contend the State's exercise of territorial jurisdiction is unconstitutional and further argue that their alleged crimes are outside the reach of Iowa's criminal jurisdiction statute, Iowa Code section 803.1, because they engaged in no conduct and caused no harm within Iowa. Because the statute cannot extend the reach of Iowa's territorial jurisdiction beyond the State's constitutional power to prosecute crimes, we first address the defendants' constitutional challenges.

We conclude the defendants' constitutional challenges to territorial jurisdiction fail regardless of whether they knew they were speaking with persons located in Iowa. The defendants committed elements of four out of the five crimes in Iowa by making statements by phone that induced the Wisconsin insurer's Davenport, Iowa employee to authorize payments of false claims. The defendants' conduct produced results in this state (deceiving the Iowa employee decision-maker to authorize false payments) that support statutory jurisdiction under section 803.1, even though the actual payments were made to nonresidents from the insurer's Wisconsin bank account.

**A. Overview of Territorial Jurisdiction.** We begin our analysis with an overview of our state's territorial jurisdiction to prosecute

criminal charges. Territorial jurisdiction refers to a state's power "to create criminal law, especially with respect to the permissible geographical scope of penal legislation." *Wagner*, 596 N.W.2d at 85 (quoting 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 16.2(a), at 342 (1984)). Territorial jurisdiction is based on each state's police power. States have a "historic right and obligation . . . to maintain peace and order within their" territorial borders. *Heath v. Alabama*, 474 U.S. 82, 93, 106 S. Ct. 433, 440, 88 L. Ed. 2d 387, 397 (1985) (quoting *Bartkus v. Illinois*, 359 U.S. 121, 137, 79 S. Ct. 676, 685, 3 L. Ed. 2d 684, 694 (1959)). The United States Supreme Court has emphasized that the power of each state to enforce its own laws implicates the state's sovereign authority:

> A State's interest in vindicating its sovereign authority through enforcement of its laws by definition can never be satisfied by another State's enforcement of *its* own laws. . . . [A] State must be entitled to decide that a prosecution by another State has not satisfied its legitimate sovereign interest.

*Id.*

"It is a generally recognized principle that a statute of one state has no extraterritorial effect beyond its borders." *Powell v. Khodari-Intergreen Co.*, 334 N.W.2d 127, 131 (Iowa 1983). "Traditionally, at least under the common law, jurisdiction to subject an accused to criminal prosecution rests in the courts of the state in which the crime was committed." *Liggins*, 524 N.W.2d at 184. Yet, many crimes involve multistate conduct. "If the commission of an offense spans jurisdictional boundaries, more than one jurisdiction may prosecute the crime." *State v. Sumulikoski*, 110 A.3d 856, 861 (N.J. 2015). In 1911, Justice Oliver Wendell Holmes articulated the "effects doctrine" under which "[a]cts done outside a jurisdiction, but intended to produce and

producing detrimental effects within it, [can] justify a State in punishing the cause of the harm." *Id.* (second alteration in original) (quoting *Strassheim v. Daily*, 221 U.S. 280, 285, 31 S. Ct. 558, 560, 55 L. Ed. 735, 738 (1911)). "In 1962, the Model Penal Code incorporated these more expansive interpretations of territorial jurisdiction." *Id.* (citing Model Penal Code § 1.03 & cmt. 1, at 35–37 (Am. Law Inst. 1962)).

> A substantial majority of the states today have statutes that adopt an interpretation of the territorial principle substantially more expansive than the traditional common law position[, s]upported by the broad view of the territorial principle set forth by Justice Holmes in . . . *Strassheim v. Daily* . . . .

4 Wayne R. LaFave et al., *Criminal Procedure* § 16.4(c), at 924 (4th ed. 2015) [hereinafter LaFave] (footnotes omitted).

Territorial jurisdiction is not coextensive with personal jurisdiction in civil cases. In civil cases, "[a] state's power to exercise personal jurisdiction over a nonresident defendant is limited by . . . the Due Process Clause of the Fourteenth Amendment." *Sioux Pharm, Inc. v. Summit Nutritionals Int'l, Inc.*, 859 N.W.2d 182, 188 (Iowa 2015). "The touchstone of the due-process analysis remains whether the defendant has sufficient 'minimum contacts with [the forum state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Id.* (alteration in original) (quoting *Ostrem v. Prideco Secure Loan Fund, LP*, 841 N.W.2d 882, 891 (Iowa 2014)). The contacts must be sufficient such that the defendant may " 'reasonably anticipate being haled into court' in the forum state." *Id.* (quoting *Ostrem*, 841 N.W.2d at 891). The civil defendant must act in a manner to "purposefully avail[] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its

laws." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528, 542 (1985)).

By contrast, in criminal cases, personal jurisdiction—the exercise of state power over the defendant—merely requires the physical presence of the defendant and can be accomplished through the defendant's arrest and extradition to the forum. *See State v. Casuso*, 253 N.W.2d 919, 921 (Iowa 1977) ("Once the defendant was brought physically before the court, the court obtained jurisdiction of his person irrespective of the manner of his being presented before the court."); 2 LaFave § 3.1(j), at 56 (noting that "[t]here is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will" unless the "defendant's presence is acquired by 'government conduct of a most shocking and outrageous character' " (footnotes omitted) (first quoting *Frisbie v. Collins*, 342 U.S. 519, 522, 72 S. Ct. 509, 512, 96 L. Ed. 541, 545–46 (1952); then quoting *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 65 (2d Cir. 1975))).

The defendants rely on civil cases to argue Iowa lacks jurisdiction to prosecute them. Their reliance on civil jurisprudence is misplaced. Most courts have held the minimum-contacts test for civil personal jurisdiction does not apply to criminal prosecutions. *See, e.g., United States v. Perez-Oviedo*, 281 F.3d 400, 403 (3d Cir. 2002) (concluding personal jurisdiction decisions are "inapposite" to criminal jurisdiction); *Hageseth v. Super. Ct.*, 59 Cal. Rptr. 3d 385, 390 (Ct. App. 2007) ("Unlike civil actions, criminal proceedings cannot take place in the absence of the defendant, because the confrontation clause of the Sixth Amendment bars criminal default judgments."); *In re Vasquez*, 705 N.E.2d 606, 609 (Mass. 1999) ("The jurisprudence of personal jurisdiction has no bearing on the question whether a person may be

brought to a State and tried there for crimes under that State's laws."); *State v. Luv Pharmacy, Inc.*, 388 A.2d 190, 193–94 (N.H. 1978) (rejecting applicability of minimum-contacts test in criminal context); *State v. Taylor*, 838 S.W.2d 895, 897 (Tex. App. 1992) ("A 'minimum contacts' analysis is not applicable to establish jurisdiction in criminal prosecutions."); *State v. Amoroso*, 975 P.2d 505, 508 (Utah Ct. App. 1999) ("The rule is well-settled that civil 'minimum contacts' analysis has no place in determining whether a state may assert criminal personal jurisdiction over a foreign defendant."); *Rios v. State*, 733 P.2d 242, 244 (Wyo. 1987) ("[T]he concept of minimum contacts . . . has no application to criminal cases."); *In re Najawicz*, 52 V.I. 311, 334–35 (2009) ("It has been consistently held, however, that [the] minimum contacts analysis is inapposite in criminal cases."). *But see United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (applying a nexus requirement for crimes on the high seas and concluding "[t]he nexus requirement . . . ensures that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into court' in this country" (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490, 501 (1980))).

Other differences between civil and criminal cases undermine the usefulness of civil precedents in analyzing territorial jurisdiction. *See* Allan Erbsen, *Impersonal Jurisdiction*, 60 Emory L.J. 1, 36–37 (2010) (comparing civil and criminal jurisdiction). The State must prove territorial jurisdiction beyond a reasonable doubt. *State v. Serrato*, 787 N.W.2d 462, 468 (Iowa 2010). Challenges to territorial jurisdiction, which go to the power of the court to hear the case, cannot be waived. 21 Am. Jur. 2d *Criminal Law* § 435 (2008). By contrast, "personal

jurisdiction may be established by waiver, consent, or estoppel." *Sioux Pharm*, 859 N.W.2d at 190. Moreover, most civil cases involve disputes between private citizens, whereas in a criminal case, the prosecutor represents the State and seeks to prove the defendant violated a criminal law of the forum.[8] *See* Robert A. Leflar, *Extrastate Enforcement of Penal and Governmental Claims*, 46 Harv. L. Rev. 193, 199 (1932). The concept of territorial jurisdiction combines jurisdiction and choice of law, which are separate issues in civil cases. *See People v. Betts*, 103 P.3d 883, 891 (Cal. 2005). Personal jurisdiction over a civil defendant does not necessarily dictate that the forum state's substantive law will govern an interstate dispute. *Gabe's Constr. Co. v. United Capitol Ins. Co.*, 539 N.W.2d 144, 146 (Iowa 1995) (holding in civil cases, Iowa generally applies the law of the forum with "the most significant relationship to the transaction and the parties" (quoting Restatement (Second) of Conflict of Laws § 188(1), at 575 (Am. Law Inst. 1971))). By contrast, the State will always apply Iowa criminal law in prosecutions. *See Wagner*, 596 N.W.2d at 85 (defining territorial jurisdiction as the power "to create criminal law, especially with respect to the permissible geographical scope of penal legislation" (quoting 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 16.2(a), at 342 (1984))). "[M]ost states that would assert jurisdiction in a case that required application of another state's

---

[8]There were significant historical practical problems prosecuting cases in which the State had no interest, including

> (1) [t]he community's direct responsibility for offenses committed within its borders . . . , and (2) the origin of the jury as a trial body, it being at first a group of men deciding cases on the basis of their own knowledge of the facts and the sense of the community in which the acts occurred, therefore necessarily drawn from that community.

Robert A. Leflar, *Extrastate Enforcement of Penal and Governmental Claims*, 46 Harv. L. Rev. 193, 198 (1932) (footnote omitted).

civil law would decline jurisdiction in a case that required it to enforce the penal law of another state." Model Penal Code and Commentaries § 1.03 cmt. 1, at 36 (Am. Law Inst. rev. ed. 1985) [hereinafter Model Penal Code] (footnotes omitted). Accordingly, our civil jurisprudence provides relatively little guidance to the determination of territorial jurisdiction in this criminal proceeding.

Courts have recognized constitutional restraints on state territorial jurisdiction. *See Liggins,* 524 N.W.2d at 184 (citing the Sixth Amendment of the United States Constitution and article V, section 6 of the Iowa Constitution, which require prosecution in the district where the crime occurred); *Sumulikoski,* 110 A.3d at 866 ("The extraterritorial application of state criminal law is subject to due process analysis. The essential inquiry . . . is what 'fundamental fairness' requires." (Citations omitted.)). We focus now on the defendants' constitutional challenges to jurisdiction.

**B. Whether the Exercise of Territorial Jurisdiction over These Defendants is Unconstitutional.** The defendants argue the exercise of territorial jurisdiction would violate their Sixth Amendment right to a jury trial where the crime occurred, as well as their rights under article V, section 6 of the Iowa Constitution, which provides Iowa district courts with jurisdiction for "criminal matters arising in their respective districts." They also assert such an exercise would violate their due process rights under the Fourteenth Amendment.[9] The defendants

---

[9]In her appellate brief, Thomas argues the due process clause in Article I, section 9 of the Iowa constitution provides greater limitations on territorial jurisdiction than the Fourteenth Amendment. No defendant raised the Iowa due process provision in district court. Thomas' motion to dismiss did not mention due process, and it rather relied on the Vicinage Clause. Accordingly, she failed to preserve any claim under the Iowa due process provision. *See State v. Prusha*, ___ N.W.2d ___, ___ (Iowa 2016).

contend they are not subject to territorial jurisdiction because they never set foot in Iowa (before their extradition); the alleged crimes were committed in Illinois and Wisconsin, not Iowa; the only victim is a Wisconsin insurer that paid claims from its Wisconsin bank account; and they had no knowledge the insurer's employees with whom they dealt by phone were in Davenport. We conclude their constitutional challenges fail. We address the constitutional provisions separately.

1. *Vicinage.* In *Liggins*, we concluded that common law limitations on state territorial jurisdiction are "preserved to some degree by the United States and Iowa Constitutions." 524 N.W.2d at 184. We noted, "The Sixth Amendment . . . provides the right to trial in 'the state and district *wherein the crime shall have been committed.*'" *Id.* (quoting U.S. Const. amend. VI). This is known as the Vicinage Clause. *See* 1 LaFave § 2.6(b), at 834.[10] Article V, section 6 of the Iowa Constitution in turn provides district courts with jurisdiction over "civil and criminal matters *arising* in their respective districts." *Liggins*, 524 N.W.2d at 184 (quoting Iowa Const. art. V, § 6). "The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407, 78 S. Ct. 875, 877, 2 L. Ed. 2d 873, 876 (1958). In *United States v. Cabrales*, the United States Supreme Court noted, "Proper venue in criminal proceedings was a matter of concern to the Nation's founders. Their complaints against the King of Great Britain, listed in the Declaration of Independence, included his transportation of colonists

---

[10]LaFave emphasizes that the role of the Vicinage Clause "has not been critical" to the analysis of territorial jurisdiction because the relevant jurisdictional statutes "limit their jurisdiction to crimes that were 'committed' within the state, as measured by conduct or consequences occurring within the State." 1 LaFave § 2.6(b), at 837.

'beyond [the] Seas to be tried.'" 524 U.S. 1, 6, 118 S. Ct. 1772, 1775, 141 L. Ed. 2d 1, 7 (1998) (footnote omitted) (quoting The Declaration of Independence para. 21 (U.S. 1776)). That is a far cry from prosecuting these defendants from neighboring states in Scott County, which is less than 200 miles from where they staged the fake accident.

The Sixth Amendment does not defeat territorial jurisdiction here. The State can show that these crimes occurred in part in Iowa based on the defendants' phone calls with the insurer's Davenport employee, deceiving him into authorizing payment of false insurance claims. It is well-settled that when a crime is committed in multiple states, it can be prosecuted in each state under the Sixth Amendment. *See, e.g., United States v. Rodriguez-Moreno,* 526 U.S. 275, 281, 119 S. Ct. 1239, 1244, 143 L. Ed. 2d 388, 395 (1999) ("[W]here a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." (quoting *United States v. Lombardo,* 241 U.S. 73, 77, 36 S. Ct. 508, 510, 60 L. Ed. 897, 898 (1916))); *United States v. Root,* 585 F.3d 145, 156 (3d Cir. 2009) (rejecting a Sixth Amendment challenge and noting that "Congress has the power to lay out the elements of a crime to permit prosecution in one or *any of the districts* in which the crucial elements are performed" (emphasis added)); *United States v. Ramirez,* 420 F.3d 134, 139 (2d Cir. 2005) (holding under Sixth Amendment that "venue is properly laid in *any* of the districts where an essential conduct element of the crime took place") (emphasis added); *State v. Ross,* 646 A.2d 1318, 1333 (Conn. 1994) ("[A] person who commits a crime partly in one state and partly in another state may be tried in either state under the sixth amendment of the United States Constitution." (quoting *Lane v. State,* 388 So. 2d 1022, 1028 (Fla. 1980))); *see also State v. Willoughby,* 892 P.2d 1319, 1332

(Ariz. 1995) (en banc) ("A defendant who commits only part of an offense in Arizona cannot invoke the vicinage clause as a shield from prosecution in Arizona."); 4 LaFave § 16.1(e), at 803 (noting that a prosecution can constitutionally be brought in multiple districts if "the offense was committed in part in each of the designated venues" and legislation provides for multiple venues). The defendants do not argue for a different standard under article V, section 6 of the Iowa Constitution. Accordingly, we apply the same standard as the Sixth Amendment and reach the same conclusion to reject the defendants' vicinage challenge. *See State v. DeWitt,* 811 N.W.2d 460, 467–68 (Iowa 2012).

2. *Due Process.* We agree with the New Jersey Supreme Court that "[t]he extraterritorial application of state criminal law is subject to due process analysis" under the Fourteenth Amendment. *Sumulikoski,* 110 A.3d at 866; *see also People v. Gayheart,* 776 N.W.2d 330, 344–45 (Mich. Ct. App. 2009) ("The application of Michigan's first-degree murder statute to defendant's conduct fully comported with the constitutional guarantee of due process."); *State v. Randle,* 647 N.W.2d 324, 329 n.4 (Wis. Ct. App. 2002) ("Territorial jurisdiction is part of the due process restrictions on the power of a court to exercise its jurisdiction over a given individual . . . ."); Model Penal Code, § 1.03 explanatory note, at 35, 10A U.L.A. 26 (2001) ("[T]he Code proposes broad jurisdictional bases, within the limits of due process."); 4 LaFave § 16.4(c) & n.107, at 932 (noting that territorial jurisdiction "legislation adheres to the territorial principle, [so] it is held not to violate due process"). We must determine whether the State's exercise of jurisdiction over the defendants offends "fundamental fairness." *Sumulikoski,* 110 A.3d at 866 (citing *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 24–25, 101 S. Ct. 2153, 2158, 68 L. Ed. 2d 640, 648 (1981)); *see also* Model Penal Code § 1.03 cmt. 1, at

40 ("[A] state should have jurisdiction over those whose conduct affects persons in the state or an interest of the state, provided that it is not unjust under the circumstances to subject the defendant to the laws of the state.").

The defendants' reliance on civil personal jurisdiction jurisprudence is misplaced. As explained above, the minimum-contacts test is inapplicable to territorial jurisdiction. The defendants alternatively urge us to adopt a nexus test followed by the United States Court of Appeals for the Ninth Circuit. *See United States v. Zakharov*, 468 F.3d 1171, 1177 (9th Cir. 2006) ("Nexus is a constitutional requirement analogous to 'minimum contacts' in personal jurisdiction analysis." (citing *Klimavicius-Viloria*, 114 F.3d at 1257)). The nexus test was adopted for federal prosecution of international defendants in foreign vessels captured on the high seas outside of U.S. territorial waters. *Id.* It requires a sufficient connection between the United States and the defendant's activities. *Id.* "Nexus may be established by a showing that 'an attempted transaction is aimed at causing criminal acts within the United States' or that 'the plan for shipping the [contraband] was likely to have effects in the United States.'" *Id.* at 1177–78 (quoting *United States v. Medjuck*, 156 F.3d 916, 919 (9th Cir. 1998)). The federal circuits are divided on whether to require such a nexus or rather simply determine whether the extraterritorial prosecution is fundamentally unfair. *See United States v. Campbell*, 798 F. Supp. 2d 293, 306–07 (D.D.C. 2011) (reviewing circuit split). Assuming without deciding that a nexus test applies to state territorial jurisdiction, we conclude the test is satisfied here. As we explain below, the defendants' phone calls with the insurer's Davenport employees constitute conduct in Iowa that produced

effects here—fraudulently inducing a Davenport employee to authorize payments of false insurance claims.

The defendants contend that due process precludes their prosecution in Iowa because they "did not know or have reason to know [their] conduct was in any way affecting Iowa or implicating Iowa." Specifically, the defendants, relying on inapposite civil jurisdiction cases, argue they were unaware the insurer's employees with whom they spoke were located in Davenport. We do not believe their ignorance of that fact excuses the defendants from prosecution here. As the court of appeals aptly observed, "the defendants knew or should have known they were committing a crime . . . in *a state*, although they may not have known which state."

Due process for purposes of territorial jurisdiction is generally satisfied when the defendant is on notice he or she may be prosecuted "somewhere." *See, e.g., United States v. Brehm*, 691 F.3d 547, 554 (4th Cir. 2012) ("Fair warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." (quoting *United States v. Al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011)); *United States v. Bocachica*, 57 F. Supp. 3d 630, 635 (E.D. Va. 2014) (holding prosecution was not inherently unfair "because the defendant committed the type of crime for which it was reasonable to expect he would be prosecuted 'somewhere' for his clearly illegal conduct"). In *United States v. Ali*, the federal court of appeals observed,

> What appears to be the animating principle governing the due process limits of extraterritorial jurisdiction is the idea that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."

> The "ultimate question" is whether "application of the statute to the defendant [would] be arbitrary or fundamentally unfair."

718 F.3d 929, 944 (D.C. Cir. 2013) (alteration in original) (citations omitted) (first quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351, 84 S. Ct. 1697, 1701, 12 L. Ed. 2d 894, 898 (1964); then quoting *United States v. Juda*, 46 F.3d 961, 967 (9th Cir. 1995)). We are not dealing with prosecution in Iowa for regulatory transgressions based on conduct that is arguably legal in the defendants' home states. To the contrary, the minutes of testimony describe clearly fraudulent conduct that the defendants knew or should have known was illegal in any state, and they knew or should have known they could be prosecuted in the state where the insurer's employees whom they intentionally deceived were located. That is, the defendants engaged in "acts that are malum in se (wrong in themselves) [rather than] merely malum prohibitum (wrong because prohibited)." *See State v. Azneer*, 526 N.W.2d 298, 299 (Iowa 1995) (contrasting "statutes that criminalize conduct that is inherently wrong" with "statutes that criminalize conduct that, although not inherently wrong, the legislature wishes to outlaw for some other reason"). Accordingly, we determine Iowa's exercise of territorial jurisdiction is neither arbitrary nor fundamentally unfair.

In *United States v. Gonzalez*, the United States Court of Appeals for the Eleventh Circuit rejected an analogous due process challenge to federal territorial jurisdiction. 776 F.2d 931, 938 (11th Cir. 1985). Gonzalez argued his prosecution violated due process because the statute only applied in "customs enforcement areas" and the defendant–seaman would not know when the vessel was in that part of the sea. *Id*. In rejecting that challenge, the *Gonzalez* court concluded that persons "embarking on voyages with holds laden with illicit narcotics" assumed

the risk of detection and prosecution. *Id.* at 940–41. Similarly, we conclude that persons engaged in multistate insurance fraud assume the risk of prosecution wherever those they deceive are located. A contrary holding would impede the State's ability to prosecute and deter multistate insurance fraud schemes perpetrated on persons in Iowa. The defendants' due process challenge to territorial jurisdiction fails.

**C. Whether the Exercise of Territorial Jurisdiction over These Defendants Complies with the Criminal Jurisdiction Statute.** We next address whether the defendants' conduct falls under Iowa's criminal jurisdiction statute. The defendants' crimes were multistate in scope. The defendants staged an automobile accident in Chicago, provided false information on repair estimates in Wisconsin and Illinois, and through phone calls from those states deceived the Wisconsin insurer's employee in Davenport, Iowa, to authorize payment on false claims from the insurer's Wisconsin bank account. We must decide whether they can be prosecuted here under Iowa Code section 803.1 despite their ignorance of the claim adjuster's Iowa location.

In *Liggins*, we noted that section 803.1 expands criminal territorial jurisdiction beyond the reach of the common law. 524 N.W.2d at 184. Entitled "State criminal jurisdiction," section 803.1 expressly extends territorial jurisdiction to prosecute crimes that occur only partly within our state's borders. Iowa Code § 803.1; *Serrato*, 787 N.W.2d at 468. Section 803.1 is patterned after the Model Penal Code. *Wagner*, 596 N.W.2d at 86; *see* Model Penal Code § 1.03, at 33–34, 10A U.L.A. 25–26. Section 803.1 provides,

> 1. A person is subject to prosecution in this state for an offense which the person commits within or outside this state, by the person's own conduct or that of another for which the person is legally accountable, if:

> *a.* The offense is committed either wholly or partly within this state.
>
> . . . .
>
> 2. An offense may be committed partly within this state if conduct which is an element of the offense, or a result which constitutes an element of the offense, occurs within this state.

Iowa Code § 803.1.

By its terms, this statute allows territorial jurisdiction if either "conduct" or a "result" constituting an element of the crime occurs within Iowa. *Id.* Therefore, we first examine whether the defendants committed at least one element of each crime charged by making false statements over the phone from neighboring states to the insurer's employee located in Davenport, Iowa. These statements induced the employee to authorize payment from the insurer's Wisconsin bank account. We will then examine whether the statements occurred "within this state." *Id.*

1. *Whether the State can establish an element of each crime charged occurred in Iowa.* For purposes of this appeal, we presume the allegations in the trial information and minutes of testimony are true. *State v. Finders*, 743 N.W.2d 546, 548 (Iowa 2008). The State charged the defendants with committing five different crimes. The trial information states the defendants "staged fake automobile accidents and made claims for financial reimbursement from insurance companies," including claims to the Sentry Insurance representative in Davenport. The Sentry employee, Perren, authorized payment of "approximately $6,805.00 being paid out on a false insurance claim." Payment was authorized for each defendant. On appeal, the State argues the defendants' fake claims submitted to the Davenport office satisfy an element of each crime charged. We conclude the State's allegations

constitute an element of four out of the five crimes charged. We address each crime separately.

Count 1 of the trial information charged each defendant with ongoing criminal conduct under Iowa Code sections 706A.1, 706A.2, 706A.4, 703.1, and 703.2. One element the State is required to prove is an "act . . . committed for financial gain on a continuing basis, that is punishable as an indictable offense under the laws of the state in which it occurred and under the laws of this state."[11] Iowa Code § 706A.1(5) (defining "specified unlawful activities"); *id.* § 706A.2(4) (criminalizing specified unlawful activity"). The defendants' fraudulent statements to Perren in Iowa satisfied this element of ongoing criminal conduct.

Count 2 charged each defendant with theft by deception under Iowa Code sections 714.1, 714.2, 702.9, 703.1, and 703.2. This charge required the State to prove each defendant "[c]reat[ed] or confirm[ed] another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true." *Id.* § 702.9(1) (defining deception); *see id.* § 714.1(3) (defining theft by deception); *see also State v. Williams*, 674 N.W.2d 69, 72–73 (Iowa 2004) (describing that element of theft by deception). The defendants'

---

[11]Making false insurance claims is an indictable offense in Iowa, Wisconsin, and Illinois. 720 Ill. Comp. Stat. 5/17-10.5(a)(1) (2011) ("A person commits insurance fraud when he or she knowingly . . . attempts to obtain . . . by deception, control over the property of an insurance company . . . by the making of a false claim . . . on any policy of insurance issued by an insurance company . . . ."); Iowa Code § 507E.3(2)(*a*) ("A person commits a class 'D' felony if the person, with the intent to defraud an insurer, . . . [p]resents . . . any . . . oral statement . . . as part of, or in support of, a claim for payment . . . pursuant to an insurance policy, knowing that such . . . statement contains any false information concerning a material fact."); Wis. Stat. § 943.395(1)(a) (2011) ("Whoever, knowing it to be false or fraudulent, does any of the following may be penalized[:] . . . [p]resents or causes to be presented a false or fraudulent claim, or any proof in support of such claim, to be paid under any contract or certificate of insurance . . . .").

statements made by phone to Perren in Iowa gave the Sentry employee the false impression that a real accident occurred. Perren acted on his false impressions in Davenport by authorizing payment to each defendant. This satisfied an element of the crime of theft by deception.

Count 3 charged each defendant with conspiracy under Iowa Code sections 706.1, 706.3, 703.1, and 703.2. A conspiracy requires "an overt act evidencing a design to accomplish the purpose" of the offense. Iowa Code § 706.1(3); *see State v. Corsi*, 686 N.W.2d 215, 218–19 (Iowa 2004) (listing elements of conspiracy). Here, the overt acts are the defendants' false statements made to Sentry's employees that facilitated the defendants' commission of theft by deception, fraudulent submissions, and ongoing criminal conduct. Perren heard the defendants' false statements (their overt acts—an element of conspiracy) in Davenport.

Count 5 charged each defendant with fraudulent submissions under Iowa Code sections 507E.2, 703.1, and 703.2. An element of this crime is a materially false oral statement made in support of an insurance claim. *See* Iowa Code § 507E.3(2)(*a*) ("A person commits a class 'D' felony if the person, with the intent to defraud an insurer, . . . [p]resents . . . any . . . oral statement . . . as part of, or in support of, a claim for payment . . . pursuant to an insurance policy, knowing that such . . . statement contains any false information concerning a material fact."). The defendants made oral statements which they knew were false by phone to Perren in Davenport, which satisfies that element of the crime.

Count 4 charged each defendant with fraudulent practices under Iowa Code sections 714.8(3) and (10), 714.10, 703.1, and 703.2. However, the minutes are insufficient to show the defendants committed any element of that crime *in Iowa*. A fraudulent practice requires proof

the defendant "tender[ed] a false certification under penalty of perjury, false affidavit, or false certificate . . . in support of a claim for compensation." *Id.* § 714.8(3). There is no reference in the minutes of testimony to any affidavit or certification under penalty of perjury or any written, signed certificate that defendants submitted to the Davenport office. Accordingly, territorial jurisdiction for prosecution of Count 4 is lacking.

In sum, the information and minutes demonstrate that the defendants' fraudulent statements made via telephone to Sentry's employee satisfy at least one element of Counts 1, 2, 3, and 5. We therefore proceed to determine whether those statements or the results of those statements occurred within this state as contemplated by Iowa Code section 803.1. However, the information and minutes assert no facts to support the charge in Count 4. The district court's dismissal of that charge was proper.

2. *Whether the defendants' telephone calls from their locations in other states to the Davenport adjuster who authorized payment constitute conduct or results within this state.* We next decide whether defendants' phone calls from outside Iowa with Sentry's decision-maker in Davenport that induced payment of false claims constitute conduct or a result that "occurs within this state" under section 803.1. A clear majority of courts in other jurisdictions have held that a defendant's phone call from outside the forum state with a victim or accomplice in the forum supports territorial jurisdiction. We begin by analyzing our own precedent and then review authorities from other jurisdictions.

We first interpreted section 803.1 in *Liggins*. The State of Iowa charged Stanley Liggins with crimes related to the abduction and death of Jennifer Lewis, age nine. 524 N.W.2d at 183. The victim lived in

Rock Island, Illinois, with her mother and stepfather. *Id.* The child was last seen alive buying gum at Mack's Liquor Store in that city around 6:30 p.m. on September 17, 1990. *Id.* Her charred body was found at 9 p.m. the same evening on an elementary school lot in Davenport, Scott County, Iowa, across the Mississippi River from Rock Island. *Id.* A medical examination revealed that she had been sexually abused before being strangled to death. *Id.* Her body was set afire after she was killed. *Id.* Liggins was charged with murder in the first degree, willful injury, sexual abuse in the first degree, kidnapping in the first degree, and arson. *Id.* The district court denied his motion to dismiss the charges for lack of territorial jurisdiction. *Id.* at 183–84. He was convicted on every charge except arson. *Id.* at 184.

On appeal, we concluded the State had jurisdiction to prosecute Liggins for murder, but not the other crimes. *Id.* at 185–86. We applied Iowa Code section 803.1(2), which provides: "If the body of a murder victim is found within the state, the death is presumed to have occurred within the state." *Id.* at 184. We concluded section 803.1(2) creates a "permissive, or rebuttable, presumption of state jurisdiction." *Id.* at 185.

> In a homicide, if the body is discovered and it is not known where the death occurred, the rebuttable presumption or inference is necessary. It is rational to infer from proof of the location of the body that the homicide was committed within the state in which the body was found.

*Id.* However, we concluded the rebuttable presumption only applied to the murder charge because there was no statutory language to extend that presumption to the other charges. *Id.* at 185–86. Without any additional evidence linking the other crimes to the state, we held those convictions had to be dismissed for lack of jurisdiction. *Id.*

In *State v. Hustead*, the court of appeals applied section 803.1 to affirm the conviction of a Missouri resident for aiding and abetting thefts committed in Iowa. 538 N.W.2d 867, 869, 871 (Iowa Ct. App. 1995). Hustead, through phone calls, encouraged two Iowans to burglarize businesses in Iowa and deliver the stolen property to him in Missouri. *Id.* at 869. The *Hustead* court noted section 803.1 "allow[s] . . . Iowa courts to assume jurisdiction when any element of the crime is committed within the borders of the state." *Id.* at 871. Because the burglaries were committed by Hustead's accomplices in Iowa, the court of appeals concluded Iowa court had territorial jurisdiction even though the Missouri defendant had never set foot in our state. *Id.* The court relied on oft-cited federal precedent to conclude, "Actions which occur outside a state, but are intended to and do produce detrimental effects within the state, justify a state in punishing the cause of the harm." *Id.* at 871 (citing *Strassheim*, 221 U.S. at 285, 31 S. Ct. at 560, 55 L. Ed. at 738)).

Our subsequent cases applying section 803.1 focused on an element-by-element analysis of the crimes. In *Wagner*, the defendant being transported to New Mexico from an Iowa prison escaped while in Texas. 596 N.W.2d at 85. We noted the three elements of escape: "(1) the defendant is '[a] person convicted of a felony'; (2) who 'intentionally escapes'; (3) 'from the custody of any public officer or employee to whom the person has been entrusted.' " *Id.* at 86 (quoting Iowa Code § 719.4(1) (1995)). We observed the first element of escape describes a status, not "conduct" as required under section 803.1(2). *Id.* Because the defendant escaped from custody in Texas, not Iowa, we held there was no conduct in Iowa as required for jurisdiction under section 803.1. *Id.* at 89. Four of nine justices dissented, noting the prisoner's escape "was clearly more

an affront to Iowa authority than to Texas authority." *Id.* at 89 (Harris, J., dissenting).[12]

In *Serrato*, we affirmed a conviction for murder and nonconsensual termination of a pregnancy when the defendant was seen fighting with the victim in Iowa shortly before her death. 787 N.W.2d at 467–68. Her body was found in Illinois. *Id.* at 467. We reiterated that territorial jurisdiction "is an essential element of every crime" and stated that "the Due Process Clause of the Fourteenth Amendment of the United States Constitution requires the State to prove it beyond a reasonable doubt." *Id.* at 468. We noted that "[a] constituent element of a criminal offense may be either an actus reus element or a mens rea element." *Id.* (quoting *State v. Anderson*, 695 N.W.2d 731, 747 (Wis. 2005)). We concluded that "taken as a whole, the circumstantial evidence . . . provide[d] substantial evidence to support an inference that Serrato engaged in conduct which manifested malice aforethought to kill [the victim] and terminate the pregnancy while in the State of Iowa." *Id.* at 471.

In the case now before us, the court of appeals, relying on decisions from other jurisdictions, concluded that "a telephone conversation may constitute conduct within the state even where the defendants (while located out of state) do not have actual knowledge the other speaker is located in Iowa." We agree. We conclude that section 803.1 provides jurisdiction when conduct or a result that is an element of the offense occurs in Iowa despite the defendants' ignorance of the physical location of the person being deceived. We hold that the

---

[12]The dissent relied on the Interstate Corrections Compact. Iowa Code ch. 913 (1995). The year after the *Wagner* decision, the legislature amended the Code to allow prosecution in Iowa of offenders who escape from custody in another state while serving a sentence on an Iowa conviction. 2000 Iowa Acts ch. 1037, § 2 (codified at Iowa Code § 719.4(5) (2001)).

defendants' phone calls to a nonresident victim's employee in Iowa that deceived him into authorizing payment of a false claim constitute conduct or a result that occurs in Iowa even if the victim's payment is sent from another state.

We likewise find support for our conclusion in the jurisprudence of other jurisdictions. The majority of decisions from other states applying equivalent statutes uphold criminal territorial jurisdiction based on an out-of-state defendant's telephonic communications with a victim or accomplice in the forum. *See, e.g.*, *Powell v. State*, 246 S.W.3d 891, 892–94 (Ark. Ct. App. 2007) (concluding "the State can show that the conduct or result that is an element of the offense occurred within Arkansas" when the defendant in Georgia by phone and email "actively deceived [the Arkansas victim] into sending him money"); *Black v. State*, 819 So. 2d 208, 211–12 (Fla. Dist. Ct. App. 2002) (affirming territorial jurisdiction to prosecute felony securities fraud based on defendant's phone calls and faxes into Florida from another jurisdiction); *State v. Meyers*, 825 P.2d 1062, 1064–65 (Haw. 1992) ("We hold that for purposes of establishing criminal jurisdiction, a telephone call constitutes conduct in the jurisdiction in which the call is received."); *State v. Woolverton*, 159 P.3d 985, 991–93 (Kan. 2007) ("Although [the defendant] spoke the threat [into his phone] in Missouri, [the victim] perceived the threat at her home in . . . Kansas. Thus, an act comprising a[n] . . . element of criminal threat was committed in Kansas."); *Sykes v. State*, 578 N.W.2d 807, 812 (Minn. Ct. App. 1998) (holding that because the defendant's threats made by phone from England were received by victims in Minnesota, " 'some part of the charged offense' was committed within Minnesota"); *State v. Santana*, No. WM–14–002, 2015 WL 628344, at *3–4 (Ohio Ct. App. Feb. 13, 2015) (holding Texas defendant

committed felony in Ohio through phone calls with Ohio accomplice to sell marijuana in Texas for delivery to Ohio); *Commonwealth v. Vergilio*, 103 A.3d 831, 832–34 (Pa. Super. Ct. 2014) (holding criminal jurisdiction existed based on out-of-state defendant's threatening phone calls to in-state victim); *Shappley v. State*, 520 S.W.2d 766, 768 (Tex. App. 1974) (holding the state had jurisdiction to prosecute defendant for offering to sell unregistered securities by phone from Arizona to a prospective buyer in Texas because criminal liability attached when the offer was made); *Carrillo v. State*, No. 08–04–0018–CR, 2005 WL 1992521, at *1–2 (Tex. App. Aug. 18, 2005) (holding jurisdiction existed to prosecute threat made by phone from out of state but received in state because the "communication occurs both at the location of the caller and the recipient" (citing *Haigood v. State*, 814 S.W.2d 262, 263 (Tex. App. 1991)); *Hopkinson v. State*, 632 P.2d 79, 100 (Wyo. 1981) (holding Wyoming had jurisdiction to prosecute an accessory to murder based on his phone calls from California to accomplices in Wyoming "just as surely as though the [defendant] was standing on Wyoming soil when he communicated his requests . . . . [because t]he telephone transmitted his presence into this jurisdiction where he could manipulate and play his local pawns"). Based on these authorities, we conclude these defendants may be prosecuted in Iowa because they deceived Sentry's Iowa employee through phone calls from neighboring states.

However, the defendants argue this case presents a dispositive distinction. The foregoing decisions involved a victim in the forum state or a crime committed by accomplices in the forum, as well as a defendant who knew he or she was communicating with someone in the forum. Here, the victim is a Wisconsin insurance company, and the defendants did not know the investigators with whom they spoke by

phone were located in Iowa. For those reasons, the defendants argue they are beyond the reach of Iowa's criminal jurisdiction statute. We disagree. Section 803.1 is satisfied when conduct or a result that is an element of the crime occurs in Iowa; the statute does not require a victim here. Nor does section 803.1 require proof the defendant knew his or her criminal communications were with a person *in Iowa* rather than another location.

Federal courts have confronted the same issue—determining where a crime occurred—when adjudicating venue challenges under statutory language similar to Iowa Code section 803.1. These federal decisions involving multidistrict crimes are instructive because the federal government must prosecute "in a district where the offense was committed." Fed. R. Crim. P. 18. Continuing offenses that span multiple venues may be prosecuted "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). *Compare id., with* Iowa Code § 803.1(1)(*a*) (extending territorial jurisdiction to prosecute offenses "committed either wholly or partly within this state"). "Determining where an offense was committed, however, has often been a sticky question." *United States v. Angotti,* 105 F.3d 539, 542 (9th Cir. 1997).

In *Angotti,* the United States Court of Appeals for the Ninth Circuit squarely rejected a similar lack-of-knowledge argument in upholding venue in a prosecution for false statements despite the defendant's ignorance of the location of the bank's decision-maker he deceived. *Id.* at 543–44. Antonio Angotti was charged with multiple financial crimes arising from false statements made on a loan application submitted to a federally-insured lending institution in the Northern District of California. *Id.* at 540–41. His application was forwarded to a bank

official in the head office in the Central District who approved the loan, relying on Angotti's false statements. *Id.* at 542. Angotti argued that venue was only proper in the Northern District because the record was insufficient to prove he knew his application would be acted upon in the Central District. *Id.* at 543.

The Ninth Circuit majority disagreed and held venue was proper in the forum "where the false statement is ultimately received for final decisionmaking." *Id.* at 542. Thus, the Ninth Circuit determined his crime was committed in part in the venue where the decision-maker was located. *See id.* ("We conclude that venue was therefore proper in the Central District, where the communication reached the audience whom it was intended to influence, even though some of the criminal conduct occurred in the Northern District, where the statements were submitted.") The Ninth Circuit concluded, "Angotti's statement was made for the purpose of influencing the bank official who had the power to approve his loan. It is irrelevant whether Angotti subjectively knew the identity or location of that official . . . ." *Id.* at 543. Similarly, we conclude it is irrelevant whether the defendants in this case knew the insurer's employee Perren was in Iowa; what matters is that the defendants sought to deceive him into authorizing payment of their false insurance claims. Because Perren received the defendants' communications in Davenport, their offenses were committed partly in Iowa.

The defendants rely on several criminal cases that declined to exercise territorial jurisdiction when the nonresident defendant spoke by phone with a person in the forum state. *Duncan v. Super. Ct.*, No. D055977, 2010 WL 740272, at *9–12 (Cal. Ct. App. Mar. 4, 2010) (holding California lacked territorial jurisdiction to prosecute Arizona

resident who telephoned California resident to arrange sex crimes in Phoenix); *State v. Palermo*, 579 P.2d 718, 719–20 (Kan. 1978) (holding Kansas lacked jurisdiction to prosecute drug dealer who refused to enter Kansas but agreed to sell drugs in Missouri to buyers from Kansas without knowledge the drugs would be resold in Kansas); *State v. Dudley*, 614 S.E.2d 623, 625–26 (S.C. 2005) (holding South Carolina lacked jurisdiction to prosecute a Georgia resident who received phone calls from informant in South Carolina to arrange drug deal in Georgia). These cases noted the lack of proof the defendant intended to produce a "detrimental effect" within the forum state. *Duncan*, 2010 WL 740272, at *11 ("Thus, there is no evidence that Duncan '*intended to produce* and *produced* detrimental effects within [California],' that he assisted a person to 'commit a crime within this state[,]' or that a crime was committed in California through 'means proceeding directly from [Duncan].'" (first and third alterations in original) (citations omitted) (first quoting *Hageseth*, 59 Cal. Rptr. 3d at 401; then quoting Cal. Pen. Code §§ 27(a)(3), 778b (2008); and then quoting Cal. Pen. Code § 778)); *Palermo*, 579 P.2d at 720 ("[A] state does not have jurisdiction over an individual for a crime committed within that state when he was located outside the state, did not intend to commit a crime within the state, and could not reasonably foresee that his act would cause, aid or abet in the commission of a crime within that state."); *Dudley*, 614 S.E.2d at 626 ("While a defendant need not be physically present in the State in order to commit a criminal offense here, the State's extraterritorial jurisdiction extends only to those who have performed acts 'intended to produce and producing detrimental effects within' our boundaries." (quoting *Strassheim*, 221 U.S. at 285, 31 S. Ct. at 560, 55 L. Ed. at 738)). However, these decisions are distinguishable. Here, the defendants

intended to induce the insurer's employee to pay false claims—a detrimental effect that occurs wherever that decision-maker is located.

In *People v. Baker*, an Illinois appellate court held Illinois had territorial jurisdiction to prosecute an Ohio resident who made threatening phone calls to a victim in Illinois. 643 N.E.2d 286, 287 (Ill. App. Ct. 1994). The *Baker* court concluded "that the defendant's *conduct* occurred entirely in the State of Ohio." *Id.* The court nevertheless upheld jurisdiction because "the alleged *result* of that conduct was harassment in Illinois. Thus, for jurisdictional purposes, the offense was committed partly in Illinois." *Id. Baker* supports prosecution of these defendants in Iowa because the result of their phone calls was the authorization by the Davenport employee to pay the false claims.

The defendants also rely in part on decisions from other states that decline to exercise *civil* personal jurisdiction based on the nonresident defendant's phone calls into the forum. *See, e.g., Margoles v. Johns*, 483 F.2d 1212, 1213, 1217–21 (D.C. Cir. 1973) (concluding the District of Columbia lacked personal jurisdiction over a nonresident defendant who phoned an Illinois congressman at his Washington, D.C. office to slander a Wisconsin physician); *Mimm v. Vanguard Dealer Servs., LLC*, No. 11–736 GMS, 2012 WL 4963315, at *3–4 (D. Del. 2012) (holding Delaware lacked personal jurisdiction over a nonresident defendant who phoned a Delaware defendant from New Jersey to induce a breach of contract). As we explained above, these civil personal jurisdiction decisions are inapposite to our analysis of territorial jurisdiction for this criminal prosecution.

The defendants argue, and the district court found, there was no victim or detrimental effect in Iowa because Sentry is a Wisconsin insurance company that paid the false claims from its Wisconsin bank

account. The State argues, and the court of appeals concluded, that there was both a result and detrimental effect in Iowa. We conclude the defendants' false statements, by inducing Sentry's Davenport employee to authorize payments, had a detrimental effect in Iowa constituting a "result" that is an element of the crimes charged for purposes of section 803.1. *See Powell*, 246 S.W.3d at 892–94 (concluding "the State can show that the . . . result that is an element of the offense occurred within Arkansas" when the defendant in Georgia by phone and email "actively deceived [the Arkansas victim] into sending him money"). Our conclusion is supported by federal decisions upholding prosecution for financial crimes in the forum where the corporate victim's decision-maker was deceived. *See Angotti*, 105 F.3d at 543; *United States v. Candella*, 487 F.2d 1223, 1228 (2d Cir. 1973).

We acknowledge that for purposes of civil personal jurisdiction, we generally consider financial harm to a corporation to occur in the state where it is headquartered or incorporated. *Sioux Pharm*, 859 N.W.2d at 197; *see also CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1079 (9th Cir. 2011) ("We have repeatedly held that a corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business."); *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1388–89 (8th Cir. 1991) (holding economic injury in a trademark-infringement case was suffered in forum where the corporation had its principal place of business and the offending product was sold). Sentry is headquartered and incorporated in Wisconsin. This does not mean the defendants' contacts with the Davenport employees are deemed to occur in Wisconsin, as the district court erroneously concluded. An Iowa victim is not required for territorial jurisdiction under section 803.1 if conduct or a result that constitutes an element of

the crime occurred in this state. It is sufficient that defendants' false statements deceived the victim's employee–decision-maker Perren in Davenport into authorizing payment of the defendants' false insurance claims.

As federal courts have recognized, a prosecution may proceed in the forum where the victim's decision-maker is located. *Angotti*, 105 F.3d at 543; *Candella*, 487 F.2d at 1228. Iowa's territorial jurisdiction over these crimes, grounded in Perren's decision made in Iowa to pay false claims, was not defeated by the fact the checks were cut from Sentry's Wisconsin bank account, a ministerial act. *See United States v. Bezmalinovic*, 962 F. Supp. 435, 439 (S.D.N.Y. 1997) (holding prosecution for mortgage fraud must proceed in district where fraudulent application was submitted and bank's decision-maker was located, rather than in forum where bank accounts were debited and credited).

In this case, the court of appeals concluded: "We should not bar the State of Iowa in pursuing its valid interest in protecting its citizens and institutions. To hold otherwise would be contrary to legitimate state concerns." We agree. Our holding is consistent with the legislature's intent to enlarge Iowa's territorial jurisdiction. *See Liggins*, 524 N.W.2d at 184 ("Criminal territorial jurisdiction in Iowa is expanded by Iowa Code section 803.1 . . . ."). The defendants' narrower interpretation would allow out-of-state defendants to defraud the Iowa employees of nonresident corporations through phone calls and avoid prosecution in this state.

## IV. Conclusion.

For the reasons set forth above, we hold the State has territorial jurisdiction to proceed with this criminal prosecution on four of the five the crimes charged. We vacate the court of appeals decision and affirm

the district court's dismissal of Count 4 of the trial information. We reverse the district court's ruling that dismissed the other counts. We remand these cases to allow the prosecution on Counts 1, 2, 3, and 5 to proceed consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED.**