**STATE of Iowa, Appellee,**

v.

**Akbar Jamal CHOUDRY, Appellant.**

**No. 95–2196.**

Court of Appeals of Iowa.

June 26, 1997.

Linda Del Gallo, State Appellate Defender, and Dennis D. Hendrickson and Ahmet S. Gonlubol, Assistant State Appellate Defenders, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, John P. Sarcone, County Attorney, and Steve Foritano and Jeff Noble, Assistant County Attorneys, for appellee.

Heard by HABHAB, C.J., and CADY and VOGEL, JJ.

HABHAB, Chief Judge.

Yuval Kedem's body was found in an area of Des Moines commonly known as the "Lost Planet" on June 19, 1995. He had been gagged and bound with duct tape and severely beaten. Police later discovered his credit card had been used at various stores in Kansas City on the same day the body was found. Kedem's BMW was recovered from a wooded area of Kansas City on June 21, 1995.

On June 22, 1995, Jamie Strasser offered information regarding Kedem's death. She implicated several people, including the defendant, Akbar Jamal Choudry, and Robert Wright. Officers obtained a search warrant for, among other places, the apartment Choudry shared with Wright. Upon its execution, the officers seized over one hundred items. Among them were items purchased in Kansas City with Kedem's credit card, store receipts and bags, a laundry basket belonging to Amanda Payne, and several white athletic socks, one of which had a drop of Kedem's blood on it. At the time the warrant was executed, Choudry was wearing a pair of Nike tennis shoes matching the description of a pair purchased with Kedem's credit card in Kansas City.

Choudry, Strasser, Wright, Amanda Payne, and Timothy Palmer were charged with first-degree murder and first-degree robbery by trial information on July 27, 1995. The State alleged they killed Kedem and stole his credit card and car. The court severed the trials. Payne entered a plea agreement with the State in exchange for her testimony against the remaining parties.

At trial in November 1995, Payne testified that on June 17, 1995, Kedem picked up Payne, Strasser, and Choudry in an area of downtown Des Moines known as "the loop." Kedem drove them to his apartment. Soon thereafter, Wright arrived and Choudry and

Wright assaulted Kedem. All four ultimately fled the apartment.

The next day Palmer, Wright, and Choudry drove Strasser and Payne back to Kedem's apartment. They had devised a plan to attack and rob Kedem. Choudry told the girls to bring Kedem to the Lost Planet later that night and there they would assault him and steal his money. After Strasser and Payne led Kedem to an isolated area of the Lost Planet, Palmer, Wright, and Choudry emerged from some bushes. They attacked Kedem. Payne testified the beating lasted for about ten minutes.

The group then left, taking Kedem and Palmer's cars, and went to the apartment shared by Wright and Choudry. There, Choudry and Wright removed their bloodied clothing and showered. The five then drove both cars to Kansas City. They went to a local mall and used Kedem's credit card to purchase numerous items at various stores. They abandoned Kedem's car in Kansas City and returned to Des Moines on June 19. After learning Kedem's body had been discovered, Wright, Payne, and Palmer drove to Kansas City to relocate Kedem's car to a more secluded area.

Choudry testified and denied going to the Lost Planet or Kansas City. He stated he was wearing Wright's shoes when the officers executed the search warrant because Wright had borrowed his shoes on June 17, 1995 and had soiled them. He denied he had any involvement in or knowledge of Kedem's death.

The jury returned guilty verdicts on both counts. On December 15, 1995, Choudry was sentenced to life imprisonment for first-degree murder and a twenty-five year term for first-degree robbery.

■ Defendant appeals. He argues that through eliciting testimony from Amanda Payne regarding Timothy Palmer's convictions, the prosecutor committed misconduct; as such, he contends the trial court erred in not granting his motion for mistrial.

■ Trial courts have considerable discretion in passing on mistrial motions, and

reversal is proper only upon a showing that discretion was abused. *State v. Ware,* 205 N.W.2d 700, 702 (Iowa 1973). To the extent defendant has raised constitutional issues, our review is de novo. *State v. Blanks,* 479 N.W.2d 601, 603 (Iowa App.1991). When the trial court responds quickly to objectionable evidence, the defendant bears a heavy burden of demonstrating a clear abuse of discretion on the part of the trial court. *State v. Keys,* 535 N.W.2d 783, 786 (Iowa App.1995); *State v. Mahoney,* 515 N.W.2d 47, 51 (Iowa App.1994).

As noted earlier, Amanda Payne entered into a plea agreement[1] with the State in exchange for her testimony against the remaining parties. In accordance with the plea agreement, she testified against Timothy Palmer at his trial. She was called as a witness by the State in the case at bar, and in her direct testimony implicated defendant Choudry to the crimes he was charged with.

At the conclusion of her direct testimony, she was cross-examined by defense counsel. During cross-examination, defense counsel attacked her credibility and attempted to impeach her testimony. She was questioned in detail by defense counsel about her deposition in the Palmer case and her trial testimony at the Palmer trial. Defense counsel attempted to show in cross-examination that because Payne was still in love with Timothy Palmer, she had motive to minimize his involvement and lie about defendant Choudry's part in the murder and robbery of the victim. Payne admitted she was Palmer's girlfriend at the time of Kedem's death and that she hated Choudry.

During her re-direct examination, Payne testified that the testimony she was giving at this trial was the same testimony she gave at Palmer's trial. The prosecutor attempted to establish that although Palmer was Payne's boyfriend, it was her testimony that led to Palmer's conviction. However, he went a step further and elicited testimony from Payne that Palmer's jury had found him guilty of first-degree murder. Defense counsel objected. The objection was sustained by

---

1. Payne pled guilty and was sentenced for the crimes of first-degree robbery and voluntary manslaughter.

the trial court, the answer stricken, and the jury told to disregard that part of Payne's testimony. The court stated:

> Well, based on the fact that I don't feel it is proper evidentiary-wise, I will sustain the objection. I will have that last answer stricken from the record and admonish the jury to disregard the witness's answer to that question.

Defense counsel, outside the presence of the jury, then moved for a mistrial alleging prosecutorial misconduct. The court denied the motion, but agreed to give a written curative instruction to the jury. Subsequently, the jury was instructed, in part, as follows:

INSTRUCTION NO. 7

> You shall base your verdict only upon the evidence and these instructions.
>
> . . . .
>
> The following are not evidence:
>
> 1. Statements, arguments, questions and comments by the attorneys.
>
> 2. Objections and ruling on objections.
>
> 3. Testimony I told you to disregard.
>
> 4. Anything you saw or heard about this case outside the courtroom.

INSTRUCTION NO. 10

> During the trial, the court has ruled upon objections to evidence which have, from time to time, been made by counsel, and this court has done according to the rules of evidence. Such rulings made by the court are the responsibility of the court solely, and in your consideration of the case you will give no significance or weight whatever to such rulings, and you will consider only such evidence as has been received before you, and which has not been stricken by the court.

We have long recognized the general sufficiency of cautionary instructions except in extreme cases. *Mahoney,* 515 N.W.2d at 51. Generally, the striking of an improper response and an instruction to the jury to disregard the response will prevent prejudice. *Keys,* 535 N.W.2d at 786. We find these curative actions taken by the trial court adequately prevented prejudice to Choudry. We note it is axiomatic that a trial court is better equipped than appellate courts can be to determine whether prejudice occurs. *See State v. Anderson,* 448 N.W.2d 32, 33 (Iowa 1989). This is because the trial court is a firsthand observer of both the alleged misconduct and any jury reaction to it. *Id.* We find Choudry has not met his burden of establishing the trial court abused its discretion. Furthermore, assuming without deciding that Choudry has preserved error on his constitutional claims, in our de novo review we find he was not denied his constitutional right to a fair trial.

Additionally, we note we have considered Choudry's pro se request for the appointment of new counsel and his allegations he was prejudiced by the fact that oral argument in Timothy Palmer's appeal was heard on the day preceding oral argument in this matter. We deny his motion and find no prejudice.

**AFFIRMED.**