# IN THE COURT OF APPEALS OF IOWA

No. 15-0226
Filed November 9, 2016

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ROBERT ARTHUR REYNOLDS,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Pottawattamie County, Gregory W. Steensland, Judge.

    Robert Reynolds appeals his conviction for first-degree murder.

**REVERSED AND REMANDED FOR NEW TRIAL.**

    Mark C. Smith, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

    Robert Arthur Reynolds, Fort Madison, pro se.

    Thomas J. Miller, Attorney General, and Linda J. Hines, Assistant Attorney General, for appellee.

    Heard by Vaitheswaran, P.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

Robert Reynolds appeals his conviction for first-degree murder, objecting to the venue of the trial and the makeup of the jury pool. Reynolds also raises claims as a pro se litigant. We determine the trial court erroneously changed venue of Reynolds's trial and Reynolds is entitled to a new trial.

Reynolds also argues a jailhouse phone call should not have been admitted into evidence because the State failed to lay the proper foundation. We decide this issue as it is likely to reoccur on retrial and conclude the State did lay the proper foundation for the recording's admission into evidence. We reverse Reynold's conviction for first-degree murder and remand to the district court for a new trial.

**I. Background Facts and Proceedings**

This case arises from events that occurred on April 8, 2014, in Oakland. Robert Reynolds; his wife, Theresa Reynolds; Theresa's daughter, A.H.; Theresa's grandchild; and a friend of Theresa's, the decedent, ate dinner together at the Reynolds's home. The decedent had intended to spend the night at Reynolds's home with the plan that Reynolds or Theresa would drive her to the airport in Omaha the next morning so she could fly to California to visit with her grandson before he deployed to Afghanistan.

After dinner, the record indicates Reynolds, Theresa, A.H., and the decedent had a social gathering with the Reynolds's next door neighbors and their children, where the adults consumed alcoholic beverages and conversed with each other while the children played games. This continued until approximately 10:30 p.m. when the neighbors and their children left the

Reynolds's home and returned to their own home. The record also indicates no trouble had erupted at this point, and everyone agreed it was an enjoyable time.

After the neighbors left, A.H. retired to her bedroom in the basement of the home. Theresa lay down on the couch in the home's living room with her grandchild to help the child fall asleep. Theresa and the child soon fell asleep. Reynolds and the decedent remained in the adjacent kitchen where they continued socializing and drinking alcohol.

Several hours later, around 3:00 a.m., A.H. awoke to loud noises coming from the upstairs of the home. She testified she left her basement bedroom and went up the stairs towards the living room and kitchen. Upon arriving, she noted a stool was tipped over, and she testified she heard arguing between Reynolds and the decedent.

A.H. grabbed the child from the living room couch and ran back downstairs to the basement. She returned back upstairs to find Reynolds pointing a gun at the decedent. At this time, she noticed Theresa standing between Reynolds and the decedent. She testified she heard Theresa pleading with Reynolds to put the gun down and also heard Reynolds telling Theresa, "Don't you see what's she's doing?"—referring to the decedent.

A.H. yelled for everyone to stop and told the decedent to run out of the backdoor of the house, which was located in the kitchen. The decedent remained in the kitchen.

A.H. testified she then returned to the basement bedroom to check on the child. As she was coming back upstairs, she testified she heard three gunshots. When she arrived at the kitchen, she saw the decedent on the kitchen floor and

blood pooled around the decedent's body. A.H. said she saw Reynolds standing in the kitchen, near the stove, still holding a gun.

Theresa testified she had been awakened by the sounds of arguing coming from the kitchen. She stated that she got up from the couch and went to the kitchen, where she found the decedent on the floor and Reynolds standing and yelling at her. Reynolds then left the kitchen, went to the adjacent master bedroom, and returned with a gun in his hand. Reynolds pushed Theresa out of the way, and he screamed that the decedent was possessed. Reynolds started shooting.

Theresa got on the floor with the decedent's body and told A.H. to call 911. The record indicates at this point Theresa got up, grabbed the gun, and ran out of the kitchen backdoor, putting the gun near the garage. A.H. then returned downstairs and called 911 from the house phone.

While A.H. was on the phone with the 911 operator, Reynolds picked up a receiver upstairs and began speaking. A.H. then hung up the phone, grabbed the child, and went back upstairs to attempt to leave the house. She testified she saw Reynolds still standing in the kitchen. After leaving the house, A.H. and the child ran to the neighbors' house—the same neighbors who had been over at the Reynolds's home just hours earlier. A.H. left the child in their care, and she went to find her mother.

Shortly thereafter, Pottawattamie County Sheriff's deputies began arriving on the scene, where they encountered Theresa in the street and heard her narrative of the events.

During this time, Reynolds remained inside his home with the decedent's body. The neighbors and police officers testified they could see him wandering and pacing around the house. Despite police demands for him to exit the home, Reynolds refused to comply. Reynolds eventually came out onto the front porch, where he apparently sat down and opened a beer. Police officers stormed the porch and apprehended him. Police officers then entered the home and found the decedent's body in the kitchen. She was pronounced dead of a gunshot wound to the head.

During the investigation, police officers took gunshot residue swabs from Reynolds, Theresa, and A.H.; however, apparently none of the swabs were ever tested. Theresa and A.H.'s clothing was apparently never tested for the presence of blood either, but Reynolds's clothing was tested with negative results.

A few hours after arriving at the Pottawattamie County jail, Reynolds made a phone call to someone named "Bobby" and said, "I killed a woman last night." Such jailhouse phone calls are recorded and maintained offsite by a third-party company, Securus.

Reynolds was charged with first-degree murder, in violation of Iowa Code sections 707.1 and 707.2(2) (2013), and on November 21, 2014, a jury convicted him. On January 21, 2015, Reynolds received a mandatory life-without-parole sentence. *See* Iowa Code § 902.1.

Reynolds appeals.

## II. Discussion

**A. Jury Pool and Change of Venue** Reynolds contends the trial court erred when it held trial in Council Bluffs in West Pottawattamie County but drew a jury pool consisting solely of residents of East Pottawattamie County. The murder occurred in Oakland, located in East Pottawattamie County. Specifically, Reynolds argues the district court violated Iowa Code section 607A.23[1] and his rights under the Sixth Amendment to the United States Constitution in that he did not have a jury panel that represented a fair cross-section of the community. Further, he argues that if Pottawattamie County is still a divided judicial district, then the district court erred in changing venue to Council Bluffs without following the procedural requirements of Iowa Rule of Criminal Procedure 2.11(10)(b)[2] and (d).[3]

To the extent Reynolds claims a violation of his Sixth Amendment right to a jury drawn from a representative cross-section of the community, our review is

---

[1] Iowa Code § 607A.23 provides:

> In counties which are divided for judicial purposes, and in which court is held at more than one place, each division shall be treated as a separate county, and the grand jury and petit jurors, selected to serve in the respective courts, shall be drawn from the division of the county in which the court is held and at which the persons are required to serve.

[2] Subsection (b) provides:

> If the court is satisfied from a motion for a change of venue and the evidence introduced in support of the motion that such degree of prejudice exists in the county in which the trial is to be held that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from that county, the court either shall order that the action be transferred to another county in which the offensive condition does not exist, as provided in rule 2.11(10)(c), or shall order that the trial jury be impaneled in and transferred from a county in which the offensive condition does not exist, as provided in rule 2.11(10)(d).

[3] Subsection (d) provides, in part, "The commencement of the trial and the jury selection process shall take place in the county in which the jury is to be impaneled. . . . The trial court shall provide transportation for the jurors to and from the place of trial . . . ."

de novo.  *See State v. Choudry*, 569 N.W.2d 618, 620 (Iowa Ct. App. 1997).  We review statutory challenges for errors of law.  *See State v. Rimmer*, 877 N.W.2d 652, 660 (Iowa 2016) (citation omitted).

Both the State and Reynolds agreed to try the case in the East Pottawattamie courthouse in Avoca.  However, logistical issues, such as lack of internet connection, lack of space for a large jury pool to assemble, lack of facilities for inmate holding and transportation, and possible issues with security led the district court to decide the trial would be held at the Pottawattamie County Courthouse in Council Bluffs in West Pottawattamie County.  The court also decided the jury pool would only include residents of East Pottawattamie County.

In the 1884 Twentieth General Assembly, the Iowa legislature divided Pottawattamie County for judicial purposes, with one judicial seat in Council Bluffs and the other in Avoca:

> That from and after the first day of January A.D. 1885 the said circuit court to be held at Avoca shall have original and exclusive jurisdiction as now provided by section 162 of the Code of Iowa of 1873, or as may be hereafter provided by law regulating the jurisdiction of said court of all civil cases including appeals and writs of error from inferior courts and other tribunals and guardianship and probate matters arising in the territory in said Pottawattamie county east of the west line of range forty.

*Pleak v. Marks & Shields*, 152 N.W. 63, 63-64 (Iowa 1915).  "[T]he [1884] act did not, of course, affect the district court, the sessions of which were thereafter, as theretofore, held at Council Bluffs, and jurors, both grand and petit, were drawn from the county as a whole."  *State v. Higgins*, 98 N.W. 244, 245 (Iowa 1903).  However, this provision was amended by the Twenty-Second General Assembly to require "grand and petit jurors [to be] drawn and summoned for the terms at

Council Bluffs from the territory west of west line or range 40, and for the terms at Avoca from the territory east of the west line of range 40." *Id.* An 1888 amendment at the Twenty-Second General Assembly "enlarged the jurisdiction of the Avoca court giving it jurisdiction over criminal matters, and providing for a grand jury in that court." *State v. Pelser*, 163 N.W. 600, 602 (Iowa 1917). The record reflects the Avoca courthouse has not functioned as a working courthouse for a decade. The clerk's office has been closed since 1992. Court is routinely held in Council Bluffs. One of the questions raised by Reynolds is whether the 1884 and 1888 legislation remained in effect to govern the location of Reynolds's 2014 trial and the geographical source of potential jurors.

During pretrial, Reynolds learned the jury pool was being assembled only from East Pottawattamie County, leading him to file a motion requesting that trial be moved to the Avoca courthouse or some other suitable location in East Pottawattamie County. Alternatively, he moved that a jury be assembled from West Pottawattamie County in accordance with Iowa Code section 602.6105(2),[4] which requires court to be held at each county seat in counties that have two county seats, and in accordance with section 607A.23, which provides that in counties with more than one county seat and in which court is held at more than one place the jury "be drawn from the division in which the court is held and at which the persons are required to serve."

Reynolds also contended the district court should draw jurors from the county as a whole and that the failure to do so denied him a representative

---

[4] Section 602.6105(2) was amended in 2015 to omit specific reference to Pottawattamie County and Avoca. 2015 Iowa Acts ch. 138, § 70.

cross-section of the community in the jury pool.  The court denied Reynolds's motion.  Trial was held in Council Bluffs but with an East Pottawattamie County jury.

Following trial, Reynolds again argued in his motion for new trial that the use of a jury from only East Pottawattamie County violated his Sixth Amendment right to a fair cross-section of the community in the jury pool.  Reynolds introduced into evidence census reports showing the minority populations of Pottawattamie County as a whole.  However, the district court again denied his motion and also denied his request for a further evidentiary hearing to determine if and to what extent minorities were represented or excluded from juries drawn exclusively from East Pottawattamie County.

On appeal, Reynolds maintains Pottawattamie County is no longer divided into two judicial county seats, and as such, he argues the jury should have been drawn from all of Pottawattamie County and not just from east or west.  Conversely, the State argues Pottawattamie County is in fact divided into two judicial county seats because the 1884 law has never been repealed, and because the incident occurred in East Pottawattamie, the district court correctly assembled a jury exclusively from the eastern part of the county.

The State's argument would apply the 1884 statute to trigger the effect of Iowa Code section 607A.23, despite the clear language of section 607 A.23 that its application is limited to counties "in which court is held at more than one place."  Only in that situation does section 607A.23 require separate jury pool— but then it requires the jury be drawn "from the division in which court is held"— Council Bluffs.

Reynolds argues in the alternative that holding trial in West Pottawattamie County but drawing jurors only from East Pottawattamie County amounted to a sua sponte order to change venue. When a county is divided for judicial purposes, each division is to be treated as a separate county. *See* Iowa Code § 607A.23. Our court has held that when a trial in a county that had been divided for judicial purposes selects jurors from the other division in that same county, the trial court has changed venue. *See State v. Ewart*, 502 N.W.2d 624, 626 (Iowa Ct. App. 1993) (explaining how a defendant requested a change of venue and trial judge determined to select jurors from the northern part of the county in a trial geographically based in the southern part). We said in *Ewart*, "When venue is changed it can be done by moving the entire trial or going to another county to select a jury and returning to the original county for trial." *Id.* at 625. In *Ewart*, we concluded the defendant had received his requested change of venue. There was no such request by Reynolds, nor did the State request a change of venue. No finding of an inability to find fair and impartial jurors in the western part of the county was made. Iowa R. Crim. P. 2.11(10)(b).

Iowa Rule of Criminal Procedure 2.11(10) allows a court to change the venue of a case when it is presented with a satisfactory motion. *See State v. Evans*, 671 N.W.2d 720, 726 (Iowa 2003). However, a court may not change venue on its own accord because when it does so, the change is improper. *See Bennett v. Carey*, 10 N.W. 634, 635 (Iowa 1881). When the district court changes venue improperly, "prejudice is conclusively presumed because an illegal act has been done," and the case should be remanded for a new trial in the appropriate venue. *Ferguson v. Davis Cty.,* 1 N.W. 505, 509 (Iowa 1879)

(rejecting the argument that defendant received a fair trial before an unprejudiced jury and was therefore not prejudiced by error).

Reynolds contends that if we are persuaded that the county remains divided, the district court incorrectly changed venue of his trial from Avoca to Council Bluffs with no motion from either Reynolds or the State. The district court changed the location of the trial but did not change the location from where it summoned potential jurors. If a change of venue was otherwise called for here, the district court should have either moved the entire case to West Pottawattamie County and summoned jurors from West Pottawattamie County or kept the case in East Pottawattamie County and held trial at an east Pottawattamie County location.

We are persuaded by Reynolds's change-of-venue argument. We reverse his conviction and remand the case to the district court for a new trial consistent with this opinion. Accordingly, we do not reach Reynolds's constitutional argument of a denial of a jury drawn from a fair cross-section of the community.

### B. Admission of Jailhouse Phone Call

Next, Reynolds argues the court erred in admitting a recording of a jailhouse phone call ostensibly made by Reynolds hours after he was arrested. Specifically, he maintains the State failed to lay a proper foundation for the recording's admission into evidence.

We review a district court's decision to admit or exclude evidence for abuse of discretion. *See State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009).

The Pottawattamie County Jail records all phone calls, and in the hours after his arrest, Reynolds apparently made a phone call to someone named "Bobby" and told this person, "I killed a woman last night."

At trial, the State called Pottawattamie County Sheriff's Office crime scene technician, Katie Pattee, to authenticate the recording. Pattee testified she understood how the recording system worked. She indicated that although the actual recordings were maintained by Securus at a different location, she had the ability to search an online database using certain parameters. For example, Pattee testified a search can be done by inmate name, inmate location, time of day, or date. She then explained the retrieval of the recordings. She stated that after a search is completed, Securus then sends Pottawattamie County Sheriff's Office a link with the requested recordings. Finally, she confirmed the system's accuracy by testifying she had completed over one hundred searches using this phone-recording-system database and that she had never received any erroneous results. The lead-investigating police sergeant who was familiar with Reynolds's voice testified that he recognized the voice on the recording to be Reynolds's.

The district court did not specify its basis for admitting the recording into evidence. The State maintains the court admitted the recording as a non-hearsay admission of a party-opponent under Iowa Rule of Evidence 5.801(d)(2), which provides, in part, "The statement is offered against a party and is the party's own statement."

Conversely, Reynolds argues the court admitted the recording under the business-records exception to the rule against hearsay. Iowa Rule of Evidence 5.803(6) provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and the regular practice of that business activity was to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with rule 5.902(11), rule 5.902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this subrule includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Reynolds maintains that the jailhouse-phone-call recordings should not have been admitted because the business record is not maintained or kept by the Pottawattamie County Jail or its employees, but rather by the third-party company, Securus.

Our test for admitting recorded conversations is whether the evidence establishes the recordings are accurate and trustworthy. *See State v. Weatherly*, 519 N.W.2d 824, 825 (Iowa Ct. App. 1994). For evidence to be admissible, it must satisfy foundational requirements. Iowa Rule of Evidence 5.901(a) states, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Here, Pattee testified as to how the recording system worked, how Securus kept and maintained the recordings, how one can search for a particular phone call or caller and on particular dates and times, how she has never had erroneous results in the over one hundred

searches she has conducted, and how once a search is completed Securus sends a link with the recording to the requestor. Additionally, the sergeant from the sheriff's department also testified he was familiar with Reynolds's voice and he was positive it was Reynolds's voice on the recording. We agree with the district could that sufficient foundation was laid such that the phone call recording was properly admitted into evidence.

### C. Reynolds's Pro Se Claims

Reynolds also raises issues in his brief filed as a pro se litigant. In view of our disposition of this appeal, we need not consider the remaining issues presented for review.

For the reasons stated above, we reverse Reynold's conviction for first-degree murder and remand to the district court for a new trial.

**REVERSED AND REMANDED FOR NEW TRIAL.**