Joseph N. SYKES, petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. C1–97–1554.

Court of Appeals of Minnesota.

May 26, 1998.

Review Denied July 16, 1998.

Mark W. Peterson, Minneapolis, for appellant.

Hubert H. Humphrey III, Attorney General, Michael A. Fahey, Carver County Attorney, Peter A.C. Ivy, Assistant County Attorney, for respondent.

Considered and decided by WILLIS, P.J., and RANDALL and KLAPHAKE, JJ.

## OPINION

RANDALL, Judge.

Appellant argues that the postconviction court erred when it denied him relief. Appellant claims that his convictions for felony terroristic threats should be vacated because the district court lacked jurisdiction; that his guilty plea was not made voluntarily, and that there was no factual basis to support his guilty plea. He also claims that his petition for postconviction relief was timely. We affirm.

## FACTS

Sykes is an English law student and 13-year former member of Eckankar, a nonprofit cult-like religious organization that has a church in Chanhassen. On September 19, 1995, Sykes was charged in Carver County District Court with six counts of terroristic threats in violation of Minn.Stat. § 609.713, subd. 1 (1996), following six incidents of threatening conduct by him that took place between January 1994 and September 7, 1995. Sykes was arrested in California on November 28, 1995, and extradited to Minnesota.

On December 22, 1995, after consulting with local counsel, Sykes appeared before the district court and pleaded guilty to Counts II and V of the complaint pursuant to a plea agreement. Count II alleged that on July 10, 1995, Sykes sent a letter to Eckankar's Minneapolis office. The letter was posted from England. According to the complaint, Sykes "charged out-of-body slime attacks" that caused damage to his clothing. Sykes "further claimed that his car was forced off the road by sorcery and filled with slime." The letter closed by stating,

[t]he pressure I am under from the members of Eckankar you have sent against me is at a level where I am not responsible. If I flip, I will find you, and I will kill you, your wife, that is your second wife, and your pathetic dog. I would enjoy it. No one would defend you.

Count V of the complaint alleged that on July 13, 1994, Sykes left a threatening telephone message directed at Douglas Kunin, Eckankar's church counsel, on Eckankar's answering machine in Minnesota. According to the complaint, the message stated, in part, that:

This is a message for Doug Kunin from Joe Sykes. As [Kunin] may remember, I was a member of Eckankar until one year ago. I left because I'd endured 9 months of the most sever [sic] black witchcraft. For one year, I continued to have black witchcraft from a devil who calls himself

Peddar Zaskq. I intend to go to America within the next few weeks to murder as many ECKists as I can. And I am putting this on tape for police purposes. At the same time, the FBI and newspapers are going to have full information in detail about all of the witchcraft methods used by members of Eckankar against me.

The call was made from England.

By the terms of the plea agreement, imposition of sentence would be stayed for 10 years on the condition that Sykes would immediately depart from the United States; he would have no contact with Eckankar; and he would not return to the United States during the period of probation. During the plea hearing, Sykes testified that: (1) he sent the letter and left the telephone message; (2) the communications originated from England; (3) the letter and the message could have caused fear in the mind of those receiving the communications; (4) both were sent in reckless disregard of that possibility; and (5) both would have some effect on the person receiving them. As part of the plea agreement, Sykes acknowledged that his guilty pleas were made knowingly and voluntarily and that he was waiving his right to a trial. The district court accepted Sykes's plea and imposed sentence in accordance with the plea negotiation. Following the hearing, Sykes immediately boarded a plane for England.

On January 11, 1996, Sykes contacted Minnesota attorney Joseph Marshall, requesting that Marshall represent him in an action to vacate his convictions. Sykes had recently found out that these Minnesota convictions could be an impediment to his admission to the English bar. On February 12, Marshall declined the representation. By letter dated February 19, Sykes attempted to persuade Marshall to accept his case. Marshall again declined the representation. Eventually, Sykes obtained his present counsel.

Before filing his petition for postconviction relief, Sykes contacted the Carver County Attorney's office, requesting that the Carver County Attorney stipulate to the vacation of the pleas, judgment, and sentence. Sykes explained to Carver County that he was applying for admission to the English bar and that the Minnesota criminal convictions were an impediment. The Carver County Attorney's office declined, indicating that Sykes's criminal record was a point to be properly considered by the English authorities and the reason offered by Sykes did not justify vacating his plea and convictions.

On February 26, 1997, Sykes filed a petition for postconviction relief, seeking to vacate the pleas, judgment, and sentence. Following a hearing on the matter, the postconviction court denied Sykes's petition. The postconviction court found that the state had jurisdiction over the charged offenses, that there was an adequate basis for Sykes's guilty plea, and that Sykes knowingly and voluntarily waived his right to trial after consulting with private counsel. The court further found that Sykes's petition for postconviction relief was not timely because it was filed 13 months after the entry of judgment. The postconviction court did consider the substantive merits of Sykes's claim as an alternative basis to deny relief. This appeal follows.

## ISSUES

Does the State of Minnesota have jurisdiction over the charged offenses?

Were Sykes's guilty pleas made voluntarily?

Is there an adequate factual basis to support the guilty pleas?

Is Sykes's petition for postconviction relief timely?

## ANALYSIS

An appellate court reviews a postconviction proceeding to determine whether the postconviction court's findings are supported by sufficient evidence. *Roby v. State*, 531 N.W.2d 482, 483 (Minn.1995). A postconviction court's decision will not be disturbed absent an abuse of discretion. *Id.*

### I.

Sykes argues there was no "operative event" that took place within Minnesota that could constitute the essential elements of the crime of making terroristic threats. Thus, he argues that the district court lacked jurisdiction over the charged offenses. Principal-

ly, Sykes argues that neither the result nor the effect of his conduct on the victims constitutes an element of terroristic threats. Rather, he argues that both the result and the effect are merely circumstantial evidence relevant to the element of intent. Thus, he argues that result and effect cannot be used to establish jurisdiction. Sykes points out that the district court found jurisdiction to try the charged offenses because the phone calls were received in Minnesota and the letter was sent into Minnesota and received. Sykes argues that the district court erred because, according to Sykes, the crime, if any, was completed on English soil and thus, Minnesota has no jurisdiction.

■ On appeal, this court reviews jurisdictional questions de novo. *State v. LaRose*, 543 N.W.2d 426, 427 (Minn.App.1996). "At common law the criminal jurisdiction of state courts was limited to crimes committed within the territorial boundaries of the state." *State v. McCormick*, 273 N.W.2d 624, 625 (Minn.1978). Extraterritorial jurisdiction for Minnesota courts to hear and try criminal offenses has been expanded by Minn.Stat. § 609.025 (1996). This section provides in relevant part that:

A person may be convicted and sentenced under the law of this state if the person:

* * * *

(3) Being without the state, *intentionally causes a result within the state prohibited by the criminal laws of this state.*

Minn.Stat. § 609.025, subd. 3 (emphasis added).

■ Both the Minnesota and United States Constitutions embody the concept of territoriality. Article I, section 6 of the Minnesota Constitution provides the right to a trial in "the county or district wherein the crime shall have been committed, which county or district shall have been previously ascertained by law." The Sixth Amendment to the United States Constitution establishes the right to a trial in "the state and district wherein the crime shall have been committed." To withstand constitutional attack under the Minnesota and United States Constitutions, "some part of the crime charged must be 'committed' within the jurisdiction." *State v. Smith*, 421 N.W.2d 315, 319 (Minn.

1988). For a district court in Minnesota to have jurisdiction in this case, some part of the offense of terroristic threats had to be committed within the territorial boundaries of Minnesota.

■ The terroristic threat statute, under which Sykes was charged, provides that an individual is guilty of a felony if he or she

threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another or * * * to cause serious public inconvenience, or in a reckless disregard of the risk of causing such terror or inconvenience * * *.

Minn.Stat. § 609.713, subd. 1 (1996). This section requires that the "defendant utter the threat with the purpose of terrorizing another." *State v. Schweppe*, 306 Minn. 395, 400, 237 N.W.2d 609, 614 (1975). "Purpose in this context means aim, objective, or intention [and][t]errorize means to cause extreme fear by use of violence or threats." *Id.* (citations omitted). The effect of a terroristic threat is not an essential element of the offense, but the victim's reaction to the threat is circumstantial evidence relevant to the element of intent. *Id.* at 401, 237 N.W.2d at 614. "Intent * * * is a subjective state of mind usually established only by reasonable inference from surrounding circumstances." *Id.*

When Sykes composed the threatening letter and made the telephone call from England, he intended those threats to reach victims within the territorial boundaries of Minnesota. Sykes accomplished that. Had Sykes not communicated his threats to his intended victims, he could not have been charged with making terroristic threats in Minnesota. For instance, assume that he drafted a letter, but then never sent it. Or assume that he wrote a threatening letter, but it got lost in the mail in England and was never received. In those hypothetical situations, Sykes would have an arguable defense, both on the merits and on the issue of whether Minnesota had jurisdiction. An individual cannot be guilty of making terroristic threats if the threat of violence is not communicated to the intended victim. *See id.* at 400, 237 N.W.2d at 614 (noting speaker cannot intentionally commit crime of terrorizing another if threat is uttered in circumstances where he

does not know or have reason to know it will be communicated to victim). A threat that is not communicated to an intended victim is generally an idle threat. But that is not our case. Sykes readily concedes that the phone call and the letter were communicated in Minnesota to the people he wanted to communicate with.

Put another way, Sykes argues that a person residing (for instance) in England or Canada or Mexico can mail or call in threats to people within the boundaries of one of America's 50 states, and can never be prosecuted for terroristic threats in that state even if they are later properly apprehended in the United States, as Sykes was here. Sykes argues weakly that only the country of origin of the threats has jurisdiction to charge a crime and that if they do not, the state where the victim receives the threats can never have an interest or jurisdiction. Sykes cites no specific Minnesota law. We consider the argument to be without merit.

The supreme court's decision in *State v. Rossbach*, 288 N.W.2d 714 (Minn.1980), is on point. In that case, defendant fired a number of shots with a high powered rifle from inside the Red Lake Indian Reservation at a deputy sheriff standing in Clearwater County after the deputy had just arrested defendant's acquaintance on a felony warrant. *Id.* at 715. Defendant argued that the offenses occurred on Indian land and therefore the state did not have jurisdiction. *Id.* The supreme court rejected defendant's argument, holding that "[b]ecause the situs of the crime occurred within Minnesota, the state has jurisdiction." *Id.; cf. Smith*, 421 N.W.2d at 320–21 (holding jurisdiction lacking where state failed to prove any part of crime occurred within state).

■ Here, the crime of making terroristic threats was complete when Sykes's threats were received by the victims in Minnesota. At that point, a significant part of the situs of the crime was within Minnesota's territorial boundaries. We conclude that because Sykes's threats were received within the territorial boundaries of Minnesota, "some part of the charged offense" was committed within Minnesota. The postconviction court did not abuse its discretion when it ruled that the district court properly exercised jurisdiction over the charged offenses.

## II.

■ Sykes claims that he was coerced into pleading guilty and argues that this court should order the withdrawal of his guilty pleas because they were not made voluntarily. We disagree.

■ For a guilty plea to be valid, "it must be accurate, voluntary, and intelligent (i.e., knowingly and understandingly made)." *Perkins v. State*, 559 N.W.2d 678, 688 (Minn. 1997). The "'involuntariness of a guilty plea * * * constitute[s] such a manifest injustice as to entitle a defendant to withdraw his plea.'" *State v. Danh*, 516 N.W.2d 539, 544 (Minn.1994) (quoting *Hirt v. State*, 298 Minn. 553, 558, 214 N.W.2d 778, 782 (1974)). Whether a plea is made voluntarily is a question of fact that will not be disturbed unless clearly erroneous. *Id.* Findings of fact are not clearly erroneous if they are supported by reasonable evidence in the record. *Id.* All the relevant circumstances must be considered when determining the voluntariness of a plea. *Id.*

During the plea hearing, Sykes testified that he understood that: (1) he was pleading guilty and that such plea was voluntary; (2) by pleading guilty, he was not entitled to a trial; (3) by pleading guilty he was not entitled to the presumption of innocence or the requirement that the state prove his guilt beyond a reasonable doubt; (4) he was foregoing the right to remain silent, to cross-examine the state's witnesses, and to call witnesses on his behalf, including the ability to subpoena witnesses located within the state; and (5) the plea petition was signed voluntarily and that he understood all the rights waived by the petition.

Now on appeal, Sykes claims that he was forced to plead guilty because: (1) he was foreigner who had never been arrested, was unprepared for it, and "was emotionally distraught" because of his incarceration; (2) he was frightened by his perception that the state intended to seek the most severe penalties if he did not plead guilty and because he believed the state intended to use false information against him; (3) his English barrister would provide funds for his Minnesota counsel's representation only on the condition that he plead guilty; and (4) his family want-

ed him home for Christmas, and if he pleaded guilty he would be home in time for Christmas.

█ We take each of appellant's claims in turn. First, the normal trauma associated with being incarcerated following an arrest is not, by itself, a basis to claim coercion. There must be something in addition, such as a showing that the state actually induced the defendant to plead guilty "through actual or threatened physical harm, or by mental coercion 'overbearing the will of the defendant.'" *State v. Ecker*, 524 N.W.2d 712, 719 (Minn. 1994) (holding state may not procure guilty plea by actual or threatened use of physical harm or mental coercion overcoming the will of defendant) (quoting *Brady v. United States*, 397 U.S. 742, 750, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747 (1970)). There is no evidence in the record to suggest that the state threatened Sykes with physical harm or that he was subjected to mental coercion.

█ Likewise, there is nothing improper about the statement by the state that it would fully prosecute him for the charges if there was not a plea agreement. *See id.* (holding threat to prosecute defendant fully if defendant does not plead guilty is constitutionally permissible). All the state was doing was pointing out its legal authority to prosecute defendants who plead not guilty and go through trial.

Sykes expressly states in his brief that he is making no claim that he received ineffective assistance of counsel by his Minnesota attorney, Bruce Hanley. The record easily supports Hanley's competent representation. The record establishes that Hanley had been in communication with Sykes over a good part of the week, including a two-hour meeting with Sykes on Wednesday evening. Sykes admits that Hanley discussed his case with him, including what Sykes's goals and desires were. Sykes concedes that he was satisfied with the resolution of his case until he found out about his problem with admission to the English bar.

The district court properly concluded that Hanley discussed the plea offer with Sykes, including criminal procedure and possible defenses. There are no facts in the record indicating that Sykes pleaded guilty because of any ignorance of the law or the facts.

█ Similarly, there is no support for Sykes's argument that he was coerced into agreeing to plead guilty because his English barrister, Martin Bowdery, would provide funds for his representation by a Minnesota attorney only on the condition that he plead guilty. According to Bowdery's affidavit, Bowdery informed Sykes that he "could only pay for Mr. Hanley" if Sykes would "cut a deal with the prosecutor" and plead guilty "so that he could leave Minneapolis and return to England without delay." The record is not that clear cut. In his letter to Hanley, Bowdery agreed to pay a retainer of $7,000 on behalf of Sykes and that any expenditure over that required Bowdery's written authority. Bowdery stated that he would speak with Sykes and then, subject to Sykes's instructions, he would retain Hanley "to trial if necessary." Bowdery told Hanley that he advised Sykes that a good outcome would be for Sykes to negotiate a plea with the prosecution, apologize for the threats, and negotiate a deal provided the prosecution agreed to immediately deport him back to England. From the record, it looks like Bowdery gave Sykes competent legal advice, and was prepared to spend further funds if needed.

Sykes got precisely the plea bargain that he wanted. The plea bargain made perfect sense to Sykes at the time. It was only months later, when Sykes learned that he now had a possible impediment to his admission to the English bar, that he decided "his plea was not voluntary." We can sympathize and understand Sykes's position. During his time with Eckankar, the record shows he experienced as many, or more, problems with them as they did with him. It may be a shame if this incident keeps him from his goal of becoming an attorney in England, but that cannot be cured by hindsight. Sykes got the plea agreement and the sentence that he wanted.

The postconviction court's findings of fact on the issue of the voluntariness of Sykes's guilty pleas are supported by the record.

**III.**

█ Sykes argues that his guilty pleas should be withdrawn because there is no factual basis to support the pleas. Sykes

claims that the factual basis for guilt is lacking because he was never questioned about his intent or state of mind at the time he sent the letter or made the telephone call and that the contents of the letter and the telephone call were never discussed. Sykes's argument is without merit. The record shows that Sykes's attorney informed him of the nature and elements of the charges against him. Sykes then decided to plead guilty. By deciding to plead guilty, Sykes waived his claim now that "he had no intent." *See State v. Hemmings*, 371 N.W.2d 44, 46 (Minn.App. 1985) (holding where defendant made tactical decision to plead guilty, "he has waived the defense of lack of intent"). Sykes also knew or should have known that his statements could certainly cause apprehension in the recipients that he might act out and commit a further act of physical violence. *See State v. Murphy*, 545 N.W.2d 909, 916 (Minn.1996) (holding defendant's actions constituted threat under terroristic threats statute where actions created " 'apprehension that its originator will act according to its tenor' and commit a future act of physical violence") (quoting *Schweppe*, 306 Minn. at 399, 237 N.W.2d at 613).

The district court could readily infer Sykes's intent to terrorize certain members of Eckankar, even if it was, from Sykes's point of view, a type of bizarre self-defense. The postconviction court properly concluded that there was an adequate factual basis to support Sykes's guilty pleas.

### IV.

■ Finally, Sykes argues that the postconviction court erred when it concluded that his petition for postconviction relief was not timely filed. We agree.

The record establishes, and the state concedes, that within a month of being sentenced, Sykes attempted to obtain local counsel to challenge his convictions. Sykes had significant difficulty in obtaining local counsel and was able to do so only in March 1996. The record further establishes that the parties attempted to resolve the matter informally before the petition for postconviction relief was filed.

■ The postconviction court concluded Sykes's petition for postconviction relief was not timely because it was filed over 13 months after the entry of judgment. The postconviction court noted that Minn. R.Crim. P. 15.05, subd. 1 allows postsentence withdrawal of a guilty plea only if the motion is timely. However, as Sykes notes, this action is one for *postconviction* relief under Minnesota Statutes chapter 590 and not a motion to withdraw under Minn. R.Crim. P. 15.05, subd. 1. Timeliness *is not required* by the postconviction statute, although it is a factor to be considered when determining whether relief should be granted. *See Fox v. State*, 474 N.W.2d 821, 826 (Minn.1991) (holding "appellant's delay in seeking relief is a relevant consideration in determining whether that relief should be granted").

■ The postconviction court erred when it concluded that Sykes's petition for postconviction relief was not timely. But the error is harmless because the postconviction court did consider the substantive merits of Sykes's claim, and we affirm the postconviction court's conclusion that Sykes's rights were not prejudiced.

### DECISION

We affirm the postconviction court's conclusion that the district court properly exercised jurisdiction over Sykes. A substantial part of the crime was committed in Minnesota where the threats were received. The situs of the charged offense of terroristic threats was within the territorial boundaries of Minnesota. The postconviction court properly concluded that Sykes's guilty plea was made voluntarily, and properly concluded that there was a sufficient factual basis for the plea.

Despite the erroneous conclusion that Sykes's petition for postconviction relief was untimely, Sykes's substantive claims were fairly considered. We affirm the postconviction court on Sykes's substantive claims on all issues.

**Affirmed.**