IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 24, 2024

## STATE OF TENNESSEE v. RONALD MATTHEW LACY

**Appeal from the Criminal Court for Loudon County**
**No. 2015CR96        Jeffery Hill Wicks, Judge**

_____

### No. E2022-01442-CCA-R3-CD

_____

A Loudon County jury convicted the Defendant, Ronald Matthew Lacy, of theft of property over $60,000. The Defendant, a Kentucky resident, entered into a transaction for the sale of a car with a Tennessee resident, but with the intent not to perform as promised and to misappropriate the money instead. The trial court sentenced him to ten years, which was suspended after service of eleven months and twenty-nine days in confinement. On appeal, the Defendant argues that the evidence was legally insufficient to support his conviction. He also asserts that the trial court lacked territorial jurisdiction and that the case should be addressed as a civil matter. Alternatively, the Defendant contends that he is entitled to a new trial because his trial counsel failed to provide effective assistance. Upon our review, we respectfully affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and KYLE A. HIXSON, JJ., joined.

John M. Gambrel, Pineville, Kentucky (on appeal); and Patrick Henry, Knoxville, Tennessee (at trial), for the appellant, Ronald Matthew Lacy.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; L. Russell Johnson, District Attorney General; and Robert C. Edwards and Jed Bassett, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

This case arises from a June 2015 dispute between Christopher Dyer, the owner of Evolution Motor Cars, a small luxury car dealership in Lenoir City, Tennessee, and the Defendant, the owner of "Matthew the Car Guy" in Kentucky. Mr. Dyer typically did not keep many cars on his lot; instead, he sourced specific vehicles requested by his customers from a small network of dealers specializing in luxury vehicles. After discovering the Defendant's services on Craigslist, Mr. Dyer decided to collaborate with him.

For each transaction, Mr. Dyer specified the type of vehicle he needed, and the Defendant would locate the car and invoice Mr. Dyer, who would then wire the funds to the Defendant's bank in Kentucky. The Defendant often utilized a "straw purchaser" to acquire the vehicle from a luxury dealership. Once the purchase was completed, the Defendant would notify Mr. Dyer of the vehicle's location, allowing Mr. Dyer to arrange for its transport to his dealership. Mr. Dyer would then recoup his costs from his customer.

### A.    THE MERCEDES

On June 3, 2015, Mr. Dyer and the Defendant began exchanging text messages regarding the purchase of a Mercedes-Benz GL450 ("Mercedes"). They eventually agreed on a purchase price of $80,410. The Defendant informed Mr. Dyer that the vehicle would be available for pickup in Holly, Michigan.

On June 10, the Defendant asked via text if Mr. Dyer had wired the funds. Mr. Dyer replied that he needed an invoice for the Mercedes before sending any money, explaining that he required a bill of sale that reflected the purchase price and the specifics of the transaction. The Defendant claimed to have emailed the bill of sale on June 9, which warranted that his company, "Matthew the Car Guy," was the legal owner of the Mercedes and had full authority to sell and transfer it. The bill of sale also named Mr. Dyer's company as the purchaser, and the Defendant signed the document. After confirming receipt of the bill of sale, Mr. Dyer transferred the funds to the Defendant.

From June 13 to June 18, Mr. Dyer made several inquiries seeking an update on the Mercedes, each time receiving assurances from the Defendant that he would soon have the vehicle. On one occasion, the Defendant apologized for the delay, citing a family emergency. By June 20, having grown frustrated with the delays, Mr. Dyer requested a refund of his money.

On June 23, Mr. Dyer emailed the Defendant expressing frustration and threatening legal action if the issue remained unresolved. The Defendant, allegedly using a friend's phone, replied and assured Mr. Dyer that he had not stolen the money and would be in touch. However, on June 24, after more silence from the Defendant, Mr. Dyer demanded the return of his funds by that afternoon. The Defendant responded that he would return a portion of the money the next day, with the rest to follow once "the check is deposited back." Mr. Dyer never heard from the Defendant again, and the Defendant did not return any of his money.

## B.     THE INVESTIGATION

On June 26, Mr. Dyer reported the situation to the Loudon County Sheriff's Office. Investigator Jason Smith traced the vehicle identification number of the Mercedes and discovered it had been purchased by the Defendant's fiancée, Leigh Ann Isaacs. The Certificate of Origin showed the vehicle was distributed by Mercedes-Benz of South Atlanta to Fannin Imports in Ashland, Kentucky. The car was then transferred to Ms. Isaacs on September 23, 2015.

Investigator Smith also obtained the Defendant's banking records, which confirmed Mr. Dyer's deposit of $80,410 into the Defendant's personal account on June 10. Before the deposit, the account balance was nearly zero. Between the time of Mr. Dyer's deposit and the next deposit into the account on June 22, some $7,640 was transferred to other accounts belonging to the Defendant. During this same period, the records indicated nearly $4,000 in personal expenditures in Kentucky and several thousand more dollars in Myrtle Beach, South Carolina. However, no payments were made to a dealership, nor were funds withdrawn to pay for the Mercedes.

## C.     TRIAL, SENTENCE, AND APPEAL

On August 10, 2015, a Loudon County grand jury indicted the Defendant on charges of theft of property valued over $60,000, with the trial beginning on May 12, 2022. During the trial, both Mr. Dyer and Investigator Smith testified to the facts above, and the Defendant also took the stand. The Defendant admitted to collaborating with Mr. Dyer on other deals and sending Mr. Dyer a bill of sale for the purchase of the Mercedes. He also testified that Ms. Isaacs, who had access to his account, was employed to purchase the Mercedes.

The Defendant denied exchanging text messages with Mr. Dyer about the Mercedes, claiming he was unaware of the content of those messages. He suggested that Ms. Isaacs or another employee might have sent the messages using devices linked to his phone. He

also denied knowing about the emails exchanged with Mr. Dyer, stating that he did not handle his email accounts and delegated that task to others.

Although the Defendant acknowledged that Mr. Dyer's funds were deposited into his personal account, he claimed to have opened a business account around that time and admitted to commingling personal and business funds. He explained that the transfer of funds between accounts was for business purposes related to different interest rates. The Defendant conceded that most of the money in his account after Mr. Dyer's deposit was indeed Mr. Dyer's money. Still, he denied making most of the subsequent withdrawals or transfers and attributed them instead to Ms. Isaacs. He acknowledged that he went to Myrtle Beach with Ms. Isaacs and her children but claimed he was unaware that the trip was paid for with Mr. Dyer's money.

At the trial's conclusion, the jury found the Defendant guilty of theft of property valued over $60,000, a Class B felony. On September 20, 2022, the trial court sentenced the Defendant to ten years as a standard Range I offender, with the sentence suspended to probation after eleven months and twenty-nine days of confinement. The Defendant filed a timely notice of appeal on October 11, 2022.

## ANALYSIS

In this appeal, the Defendant argues that the evidence was legally insufficient to sustain his conviction because the State failed to prove that he did not have Mr. Dyer's effective consent to take the money. He also asserts that the State of Tennessee did not have territorial jurisdiction to prosecute the offense and that because the parties had a valid contract, any breach of that contract only gave rise to civil liability. In the alternative, the Defendant argues that he is entitled to a new trial because he received the ineffective assistance of counsel at trial.

We address each of these issues in turn.

### A.    LEGAL SUFFICIENCY OF THE EVIDENCE

The Defendant first challenges the legal sufficiency of the evidence supporting his conviction for theft of property. Tennessee Code Annotated section 39-14-103(a) (2018) provides that "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." The Defendant does not challenge that he obtained or exercised control over Mr. Dyer's money or that he intended to deprive Mr. Dyer of that property. Instead, he argues only that he had Mr. Dyer's effective consent to receive the

4

money as part of a contract or purchase agreement for the Mercedes. In response, the State argues the evidence shows that Mr. Dyer could not give "effective consent" for the Defendant to have his money because the Defendant obtained the transfer through deception and false representations. We agree with the State.

### 1. Standard of Appellate Review

"The standard for appellate review of a claim challenging the sufficiency of the State's evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review is "highly deferential" in favor of the jury's verdict. *See State v. Lyons*, 669 S.W.3d 775, 791 (Tenn. 2023). Indeed, "[w]hen making that determination, the prosecution is afforded the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citation and internal quotation marks omitted). To that end, "[w]e do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (citations omitted). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citation and internal quotation marks omitted).

### 2. Effective Consent

The Defendant challenges whether the State sufficiently proved that he did not have Mr. Dyer's effective consent to receive the money for the Mercedes. Our General Assembly has defined "effective consent" as being "assent in fact, whether express or apparent." Tenn. Code Ann. § 39-11-106(a)(11) (2018). However, consent cannot be effective when it is "[i]nduced by deception or coercion[.]" *Id.* In this context, "deception" is a statutorily defined term, and, in relevant part, it means that a person knowingly:

> (i) Creates or reinforces a false impression by words or conduct, including false impressions of fact, law, value or intention or other state of mind that the person does not believe to be true; [or]
>
> . . . .
>
> (iii) Fails to correct a false impression of law or fact the person knows to be false and:

5

(a)    The person created; or

(b)    Knows is likely to influence another; [or]

. . . .

(vi)    (a)    Promises performance that at the time the person knew the person did not have the ability to perform or that the person does not intend to perform or knows will not be performed, except mere failure to perform is insufficient to establish that the person did not intend to perform or knew the promise would not be performed . . . .

*Id.* § 39-11-106(a)(7)(A).

Viewing the evidence in a light most favorable to the State, the proof shows that Mr. Dyer's consent to send the money was not effective because it was induced by the Defendant's deception. On June 9, the Defendant created and sent to Mr. Dyer a bill of sale for the Mercedes. By the Defendant's own admission at trial, this bill of sale contained false representations of fact in most of its material aspects. It warranted that the Defendant's company, Matthew the Car Guy, was the legal owner of the Mercedes, and it identified the vehicle by a specific vehicle identification number. The bill of sale also identified that the Defendant's company had "full right and authority to sell and transfer" the Mercedes, and the Defendant signed the document. When the Defendant sent the bill of sale to Mr. Dyer, neither the Defendant nor his company owned the Mercedes, nor was he in the process of purchasing it. A rational juror could find that the Defendant created and sent a bill of sale in which no material facts were true at the time it was sent.

In addition, a rational juror could have found that the Defendant created this false bill of sale to influence Mr. Dyer to send the full purchase price from his accounts in Tennessee. On June 10, the Defendant asked Mr. Dyer whether he had wired the purchase money yet. Mr. Dyer responded that he needed an invoice and inquired about the vehicle's status. When the Defendant responded that the deal would be ready "late today or tomorrow," Mr. Dyer again conditioned his payment on the Defendant's sending an invoice. The Defendant replied that he sent the bill of sale the day before, and Mr. Dyer wired the funds to the Defendant only after confirming this representation to be true.

When Mr. Dyer's payment did not come through immediately, the Defendant again contacted Mr. Dyer and falsely claimed that he was cutting a check to purchase the Mercedes and did not want any delays. However, when the Defendant received Mr. Dyer's $80,410 into his account, he wrote no checks to a dealership. Instead, thousands of dollars were transferred to other accounts, and several thousands more were spent on the Defendant's personal expenses, including items in Kentucky and a vacation trip to Myrtle

6

Beach. *Cf. State v. Brewer*, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996) (finding an intent to deceive, in part, when the defendant used the victim's money to pay for items not part of the agreement). Over the next two weeks, the Defendant continued to falsely represent the deal's status, and he refused to return the money as Mr. Dyer had requested. *Cf. State v. Toth*, No. E2015-00022-CCA-R3-CD, 2016 WL 909106, at *14 (Tenn. Crim. App. Mar. 9, 2016) (affirming defendant's intent to deceive, in part, stating that "when the victims did not receive any money from [d]efendant and [d]efendant was asked when the money would be returned, [d]efendant made numerous excuses without ever repaying the money to the victims"), *perm. app. denied* (Tenn. Aug. 18, 2016).

A reasonable juror could have found that the Defendant never intended to obtain and transfer the Mercedes to Mr. Dyer as he agreed to do. At trial, the Defendant did not deny that his expenses were actually paid with Mr. Dyer's money. Instead, he testified that he did not know that Mr. Dyer's money paid those expenses and that Ms. Isaacs accessed the account. However, when we assess a challenge to the legal sufficiency of the evidence on appeal, we must view the evidence in a light most favorable to the State and disregard all countervailing evidence. The jury was able to assess the evidence and the Defendant's credibility, and it obviously discredited his explanations, as was its prerogative to do. *Cf. State v. Shaw*, No. W2001-02430-CCA-R3-CD, 2003 WL 141046, at *9 (Tenn. Crim. App. Jan. 16, 2003) ("The jury observed the witnesses and heard the testimony. Therefore, the jurors were in the best position to make determinations as to whether the defendant had effective consent."), *perm. app. denied* (Tenn. July 7, 2003).

To that end, a rational juror could easily conclude that the Defendant never intended to perform as promised and that his false representations to Mr. Dyer were intended to deceive and influence Mr. Dyer into sending the money. Because the evidence is legally sufficient to establish that the Defendant did not have Mr. Dyer's effective consent to obtain the money, we respectfully affirm the Defendant's conviction for theft of property. *See State v. Hutchinson*, No. E2010-01053-CCA-R3-CD, 2011 WL 1621997, at *5 (Tenn. Crim. App. Apr. 25, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011); *State v. Pauli*, No. M2002-01607-CCA-R3-CD, 2003 WL 21302991, at *9 (Tenn. Crim. App. June 5, 2003), *perm. app. denied* (Tenn. Oct. 27, 2003).

## B.    TERRITORIAL JURISDICTION

The Defendant next argues that this case should be dismissed because the trial court lacked territorial jurisdiction to hear and try his case. He asserts that because he never came to Tennessee and because he received the money from Mr. Dyer in Kentucky, all the acts alleged to constitute theft occurred in Kentucky. Thus, he maintains, the alleged offense was neither commenced nor consummated in Tennessee. In response, the State

7

maintains that the Defendant consummated the crime in Tennessee and that Tennessee has territorial jurisdiction. We agree with the State.

Generally, "before a court may exercise judicial power to hear and determine a criminal prosecution, that court must possess three types of jurisdiction: jurisdiction over the defendant, jurisdiction over the alleged crime, and territorial jurisdiction." *State v. Legg*, 9 S.W.3d 111, 114 (Tenn. 1999). The concept of territorial jurisdiction recognizes the power of a state to punish criminal conduct that occurs within its borders, and "[e]very person, whether an inhabitant of this or any other state or country, is liable to punishment by the laws of this state, for an offense committed in this state[.]" *See* Tenn. Code Ann. § 39-11-103(a) (2018). However, the doctrine also recognizes that the state's "criminal law is of no force and effect beyond its territorial limits." *Legg*, 9 S.W.3d at 114 (citations omitted). Thus, if a court lacks territorial jurisdiction, then a defendant's conviction is void. *State v. Ritchie*, 20 S.W.3d 624, 631 (Tenn. 2000). Territorial jurisdiction is a question of fact for the jury and must be proven beyond a reasonable doubt. *State v. Beall*, 729 S.W.2d 270, 271 (Tenn. Crim. App. 1986).

Importantly, a crime need not wholly occur in Tennessee before the State may prosecute the offense. As our General Assembly has recognized, an offense is deemed to have been committed in Tennessee when the offense is either commenced or consummated within the state. Tenn. Code Ann. § 39-11-103(b)(1), (c). A defendant *commences* an offense in this state when "he or she completes at least one of the elements which constitute the crime." *State v. Wagner*, No. W2019-00745-CCA-R3-CD, 2020 WL 1847653, at *4 (Tenn. Crim. App. Apr. 13, 2020) (citation and internal quotation marks omitted), *no perm. app. filed*. Likewise, a defendant *consummates* an offense "when the last element necessary for commission of the crime is satisfied." *State v. Johnson*, No. M2005-02855-CCA-R3-CD, 2006 WL 3498046, at *4 (Tenn. Crim. App. Nov. 21, 2006), *no perm. app. filed*; *Legg*, 9 S.W.3d at 116 n.3 ("Non-continuing offenses are consummated when the last element of the offense is satisfied.").

In this case, the record shows that the Defendant physically remained in Kentucky at all times and received Mr. Dyer's money in Kentucky. However, the Defendant's actions reached across the border into Tennessee and completed elements of the crime in this state. As we noted above, the Defendant sent a series of emails and text messages to Mr. Dyer in Tennessee to induce Mr. Dyer to complete the transaction. For example, on June 10, the Defendant sent a text message to Mr. Dyer asking him whether he had wired the money. When Mr. Dyer responded that he needed an invoice for the Mercedes before he would send any money, the Defendant explained in a response text that he had emailed the bill of sale the previous day.

The Defendant signed the bill of sale and indicated that Matthew the Car Guy, Inc., was selling the Mercedes to Evolution Motorcars, Inc., a Tennessee business. Although

8

this document was fictitious, the Defendant sent it to Mr. Dyer, who was in Tennessee, to obtain money from him without his effective consent.  Indeed, Mr. Dyer sent his money from Tennessee to Kentucky only after confirming that he had received the signed bill of sale.  A rational juror could have inferred that at least one element of the theft offense occurred in Tennessee, as the Defendant reached into Tennessee to induce, through deception, Mr. Dyer to send money and thereby obtain the victim's property without his effective consent.  *See* Tenn. Code Ann. §§ 39-14-103(a); 39-11-106(a)(11)(A).

It is of no moment that the Defendant was not physically present in Tennessee, as he caused an element of the crime to occur in Tennessee through his phone calls, emails, and text messages.  *See* Tenn. Code Ann. § 39-11-103(b)(2)(B) ("It is no defense that the person charged with the offense was outside of this state when the offense was consummated, if the person used . . . [o]ther means proceeding directly from the person.").  Although our courts have not squarely addressed this issue in the context of the theft statute, a divided panel of this court recently recognized that "electronic communications are 'means proceeding directly from the person' for purposes of establishing territorial jurisdiction."  *State v. Berkebile*, No. E2022-01700-CCA-R3-CD, 2024 WL 2881089, at *13 (Tenn. Crim. App. June 7, 2024), *perm. app. pending*.

*Berkebile*'s conclusion is consistent with that drawn repeatedly by our sister states, which have held that various forms of communication to persons in the forum state are sufficient to establish territorial jurisdiction.  *See Powell v. State*, 246 S.W.3d 891, 894 (Ark. Ct. App. 2007) (holding that Arkansas had territorial jurisdiction over theft and computer fraud charges when Georgia resident sent emails and had phone calls with Arkansas resident in which he "actively deceived [her] into sending him money"); *People v. Baker*, 643 N.E.2d 286, 287 (Ill. App. Ct. 1994) (territorial jurisdiction established by telephone calls into jurisdiction when the result of the conduct was criminal); *State v. Rimmer*, 877 N.W.2d 652, 672 (Iowa 2016) (recognizing that a majority of other states "uphold criminal territorial jurisdiction based on an out-of-state defendant's telephonic communications with a victim or accomplice in the forum"); *Sykes v. State*, 578 N.W.2d 807, 812 (Minn. Ct. App. 1998) ("Here, the crime of making terroristic threats was complete when Sykes's threats were received by the victims in Minnesota.  At that point, a significant part of the situs of the crime was within Minnesota's territorial boundaries."); *Reger v. State*, 598 S.W.2d 868, 871 (Tex. Crim. App. 1980) (affirming territorial jurisdiction over a theft charge when the victim was induced to perform service by the defendant's phone call from Guadalajara, Mexico).  Accordingly, we conclude that the proof was sufficient to establish beyond a reasonable doubt that the Criminal Court for Loudon County had territorial jurisdiction over the offense for which the Defendant was convicted.

## C.     THEFT AND ALLEGED CONTRACTS

Next, the Defendant argues that the parties had a valid contract and that the State should not have prosecuted him for what amounted to a breach of contract.  Relying on *State v. Amanns*, 2 S.W.3d 241 (Tenn. Crim. App. 1999), he asserts that his actions amounted only to a failure to comply with contractual obligations and did not rise to the level of criminal liability.  In response, the State contends that *Amanns* is inapposite because the evidence plainly established that the Defendant intended to deceive Mr. Dyer and take his money without his effective consent.  We agree with the State.

The Defendant appears to challenge whether the trial court possessed subject matter jurisdiction of the case, as he contends that the presence of a contract for the purchase of the Mercedes means that "[t]his action is civil in nature and should never have been prosecuted as a criminal matter."  Of course, "subject matter jurisdiction involves a court's lawful authority to adjudicate a controversy brought before it."  *State v. Cawood*, 134 S.W.3d 159, 163 (Tenn. 2004).  "Whether a court has subject matter jurisdiction is a question of law, and our review is de novo with no presumption of correctness." *Abdur'Rahman v. State*, 648 S.W.3d 178, 187 (Tenn. Crim. App. 2020).

In *Amanns*, the defendant contractor agreed to remodel a homeowner's basement for $16,000, receiving an initial payment of $6,000.  He deposited some of this money with a lumber company for materials but later stopped work after the homeowner expressed dissatisfaction.  The lumber company gave Amanns a partial refund, which he did not return to the homeowner.  Although Amanns was convicted of theft, this court reversed the conviction on appeal, finding no intent to defraud.  We noted that Amanns used the initial payment for project materials and only stopped work after a dispute arose, indicating a breach of contract rather than theft.  *Amanns*, 2 S.W.3d at 242-245.

*Amanns* simply does not stand for the broad proposition that the presence of a contract either immunizes a party from criminal liability or divests a court of criminal jurisdiction.  In the rare case where we have reversed a conviction based on *Amanns*, we have focused on the defendant's lack of intent to obtain money from the victim through fraud or deception, not on the presence of a contract itself. *See State v. White*, No. M2023-00964-CCA-R3-CD, 2024 WL 2846875, at *8 (Tenn. Crim. App. June 5, 2024), *no perm. app. filed*.  Otherwise, where the proof shows that a defendant took or exercised control over the victim's money without an intent to perform, we have affirmed convictions for theft notwithstanding the presence of an alleged contract. *See, e.g.*, *Hutchinson*, 2011 WL 1621997, at *5; *Pauli*, 2003 WL 21302991, at *9.  In other words, criminal liability for theft of property can exist, even in a contractual context, when the elements of the crime can be established beyond a reasonable doubt. *State v. Carder*, No. M2022-00641-CCA-R3-CD, 2023 WL 5439784, at *14 (Tenn. Crim. App. Aug. 24, 2023), *no perm. app. filed*.

10

As explained above, the evidence here was sufficient to permit a rational juror to find each of the elements of theft beyond a reasonable doubt. The proof established that after he influenced Mr. Dyer to wire the money to his personal account, the Defendant immediately began transferring and withdrawing Mr. Dyer's money for reasons unrelated to the purchase of the Mercedes. In fact, most, if not all, of the withdrawals were for personal reasons, such as for store purchases and vacation expenditures. After that, the Defendant falsely represented the status of the deal, and when Mr. Dyer demanded a refund, the Defendant assured him that he would get part of his money soon and the rest later. However, Mr. Dyer never received either a refund of his money or the Mercedes he paid for. Because the record establishes that the Defendant intended to deprive the victim of his money without the victim's effective consent, the presence of an alleged contract does nothing to immunize the Defendant from his criminal actions. *See Hutchinson*, 2011 WL 1621997, at *5; *Pauli*, 2003 WL 21302991, at *9. Respectfully, the Defendant is not entitled to relief on these grounds.

## D.     INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, the Defendant argues that he is entitled to a new trial because he received the ineffective assistance of counsel. Although this claim is raised on appeal, we note that the Defendant did not first present this claim to the trial court in a timely motion for a new trial. *See* Tenn. R. Crim. P. 33(b).

We have recognized that "[b]efore a defendant may raise an issue on appeal as the basis for seeking a new trial, the defendant must present the issue to the trial court in a timely, written motion for a new trial." *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *2 (Tenn. Crim. App. Oct. 30, 2023), *no perm. app. filed*. Although the Defendant filed a timely notice of appeal, he did not file a timely motion for a new trial.[1] A trial court does not have jurisdiction to consider an untimely motion for a new trial, and an untimely motion waives plenary review of all issues on appeal that could have resulted in a new trial. *See, e.g.*, *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010); *State v. Manning*, No. E2022-01715-CCA-R3-CD, 2023 WL 7439203, at *3 (Tenn. Crim. App. Nov. 9, 2023), *perm. app. denied* (Tenn. May 16, 2024).

---

[1] The trial court entered the judgments of conviction on September 20, 2022. As such, the Defendant had thirty days, or until October 20, 2022, in which to file a notice of appeal or a motion for a new trial. *See* Tenn. R. Crim. P. 33(b); *State v. Stephens*, 264 S.W.3d 719, 729 (Tenn. Crim. App. 2007) (holding that the filing of the uniform judgment document constitutes the entry of the "order of sentence" for purposes of Rule 33), *abrogated on other grounds as stated in State v. Beaty*, No. M2014-00130-CCA-R3-CD, 2016 WL 3752968, at *20 (Tenn. Crim. App. July 8, 2016). However, although the Defendant filed a timely notice of appeal during this time, he did not file a motion for a new trial until October 28, 2022, eight days after the deadline.

More importantly, even if his motion for a new trial had been timely, the Defendant did not raise a claim in that motion alleging that he had received the ineffective assistance of counsel at trial. Instead, he raised this issue for the first time on appeal. As such, "[t]he appellate record does not contain evidence related to the Defendant's ineffective assistance claims, and a trial court has not had the opportunity to consider the allegations and to provide findings of fact and conclusions of law." *State v. McAdoo*, No. M2018-01113-CCA-R3-CD, 2019 WL 2597784, at *2 (Tenn. Crim. App. June 25, 2019), *no perm. app. filed*. We respectfully conclude that this issue has been waived because the Defendant failed to present it to the trial court in a timely, written motion for a new trial. *Funk*, 2023 WL 7130289, at *2; *State v. Abraham*, No. W2016-01497-CCA-R3-CD, 2017 WL 972153, at *4 (Tenn. Crim. App. Mar. 13, 2017) ("Because the defendant raises ineffective assistance of counsel for the first time on appeal, it has been waived."), *no perm. app. filed*.

## CONCLUSION

In summary, we hold that the evidence was legally sufficient to sustain the Defendant's conviction for theft of property. We also hold that the trial court possessed both territorial jurisdiction and subject matter jurisdiction to prosecute the Defendant for theft in Tennessee. Finally, we hold that the Defendant has waived his issue regarding the ineffective assistance of counsel by raising it for the first time on appeal. We respectfully affirm the judgment of the trial court.

_____
TOM GREENHOLTZ, JUDGE